In the

# United States Court of Appeals
## For the Eleventh Circuit

FLORIDA EAST COAST HOLDINGS CORPORATION,

*Plaintiff-Appellant*,

v.

LEXINGTON INSURANCE COMPANY, *et al.*,

*Defendants-Appellees*.

On Appeal from the United States District Court for
the Middle District of Florida

## PRINCIPAL BRIEF OF APPELLANT FLORIDA EAST COAST HOLDINGS CORPORATION

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville St., Ste. 500
Raleigh, NC 27601
T: (919) 755-6688
jellis@mcguirewoods.com

Thomas E. Bishop
Frederick D. Page
Kyle William Mason
BISHOP PAGE & MILLS, PLLC
510 N. Julia Street
Jacksonville, Florida 32202
Tel. (904) 598-0034
tbishop@bishoppagemills.com
fpage@bishoppagemills.com
kmason@bishoppagemills.com

*Attorneys for Plaintiff-Appellant Florida East Coast Holdings Corporation*
(*additional counsel listed inside cover*)

Thomas R. Brice
MCGUIREWOODS LLP
50 N. Laura St., Ste. 3300
Jacksonville, FL 32202
T: (904) 360-6335
tbrice@mcguirewoods.com

Francis J. Aul
MCGUIREWOODS LLP
888 16th Street NW, Ste. 500
Washington, DC 20006
T: (202) 857-1713
faul@mcguirewoods.com

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In compliance with 11th Cir. R. 26.1-1, the undersigned certifies that the following is a complete list of all trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, and includes subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

1. 1102952 B.C. Unlimited Liability Company

2. AIG Property Casualty Inc.

3. AIG Property Casualty U.S., Inc.

4. Allied World Assurance Company Holdings, Ltd.

5. Allied World Assurance Company Holdings I, Ltd.

6. Allied World Assurance Company, Ltd.

7. Allied World Assurance Company (U.S.) Inc.

8. Allied World Assurance Holdings (Ireland) Ltd

9. Allied World Assurance Holdings (U.S.) Inc.

10. Allied World Insurance Company

11. American International Group, Inc. (NYSE: AIG)

12. Aspen American Insurance Company

13. Aspen Insurance Holdings Limited (NYSE: AHL-E)

14. Aspen Specialty Insurance Company

15. Aspen U.S. Holdings, Inc.

16. Aspen (UK) Holdings, Limited

17. Aul, Francis

18. Axa S.A. (OTCMKTS: AXAHY)

19. Barksdale, Patricia D. – U.S. Magistrate Judge

20. Bishop Page & Mills, PLLC

21. Bishop, Thomas E.

22. Brice, Thomas R.

23. Corrigan, Timothy J. – U.S. District Judge

24. Ellis, Jonathan Yates

25. EXEL Holdings Limited

26. Fairfax Financial Holdings Limited (OTCMKTS: FRFHF)

27. Fields Jr., Paul L.

28. Florida East Coast Holdings Corporation

29. Fulton, Wendy Stein

30. Glaubinger, Wayne R.

31. Goodman, Perry R.

32. Grupo México Transportes, S.A.B de C.V.

33. HCC Insurance Holdings, Inc.

34. Houston Casualty Company

35. Indian Harbor Insurance Company

36. Ironshore Holdings (U.S.) Inc.

37. Ironshore Specialty Insurance Company

38. Kahn, Stephen A.

39. Krejci, Eric T.

40. Kynes, Cameron G.

41. Lexington Insurance Company

42. Liberty Mutual Group, Inc.

43. Liberty Mutual Insurance Company

44. Liberty Mutual Holding Company Inc.

45. LMHC Massachusetts Holdings Inc.

46. Mason, Kyle William

47. McGuireWoods LLP

48. Mound Cotton Willan & Green Grass, LLP

49. OCM Goldfish Inc.

50. Oostdyk, Scott C.

51. Sheldon, Scott J.

52. Tokio Marine Holdings, Inc. (OTCMKTS: TKOMY)

53. Tokio Marine & Nichido Fire Insurance Co. Ltd.

54. Turetzky, Brooke D. Oransky

55. Walsh, Sean Patrick

56. Watsa, Prem

57. X.L. America, Inc.

58. XL Bermuda Ltd

59. XL Financial Holdings (Ireland) Limited

60. XL Group Ltd

61. XLIT Ltd.

62. XL Reinsurance America Inc.

63. XL Specialty Insurance Company

Appellant is a wholly owned subsidiary of Grupo México Transportes, S.A.B de C.V.

Respectfully submitted,

*/s/ Thomas E. Bishop*
Attorney

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant Florida East Coast Holdings Corporation ("FEC") respectfully requests oral argument due to the complicated insurance policy language at issue. The insurance policy is a complex manuscript document with overlapping insurance clauses. The Insurers, six sophisticated insurance companies who underwrote the policy, press an unusual and contra-textual policy interpretation which the district court acknowledged requires significant "mental gymnastics" to understand. (D91:15).[1] Oral argument would assist the Court in untangling the steps employed by the district court and the Insurers and in understanding the multiple coverage and deductible provisions at issue.

---

[1] "(D91:15)" refers to district court docket entry 91, page 15. Pagination follows the district court's stamped page number, not any internal pagination within filed documents. All record cites herein follow this format.

i

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT .............................................. i

TABLE OF CONTENTS.......................................................................... ii

TABLE OF CITATIONS ....................................................................... iv

STATEMENT OF JURISDICTION....................................................... vii

STATEMENT OF THE ISSUES............................................................1

INTRODUCTION ...............................................................................2

STATEMENT OF THE CASE...............................................................3

     I.      Statement of Facts ................................................................3

           A.     FEC paid for broad all-risk insurance........................................4

           B.     FEC incurs expenses in taking action to reduce its Irma losses. ...

               ..................................................................11

           C.     The Insurers pre-deny FEC's claims pre-submission...............12

     II.     Course of Proceedings.......................................................15

     III.    Standard of Review .........................................................17

SUMMARY OF THE ARGUMENT ....................................................18

ARGUMENT ..................................................................................21

     I.      Principles of Florida insurance law favor FEC's interpretation and

     support coverage........................................................................21

     II.     FEC's covered losses exceed the correct deductible. .........................24

A.      The $750,000 Railroad Operations deductible applies.............24

B.      The sue-and-labor clauses cover FEC's $2,148,690 in protective expenses................................................................27

C.      The Business Interruption and Consequential Losses clauses cover $3,388,423 of FEC's lost revenues. ...........................................37

D.      The Professional Fees clause covers FEC's $68,768 in Pyxis fees…...............................................................................41

E.      The Preservation clauses do not require the application of a deductible over $750,000. ....................................................42

     1.     The Section B Preservation clause does not trigger an enhanced deductible.................................................................44

     2.     The Section C Preservation Extension does not trigger an enhanced deductible.................................................................47

     3.     Without an enhanced deductible, the two Preservation clauses provide redundant coverage for FEC's expenses and at least $1,291,823 of FEC's lost business. ...................................50

F.      The Insurers' interpretation leads to absurd results.................50

III.    Alternatively, genuine issues of material fact preclude summary judgment to the Insurers. ................................................53

CONCLUSION .........................................................................57

CERTIFICATE OF COMPLIANCE .......................................................58

CERTIFICATE OF SERVICE .............................................................58

## TABLE OF CITATIONS

### CASES

*Aleman v. Gervas*, 314 So. 3d 350 (Fla. 3d DCA 2020) ........................................48

*Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29 (Fla. 2000) ..............................23

*Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600 (Fla. 1st DCA 1995)...............40

*Certain Underwriters at Lloyd's, London, Subscribing to Pol'y No. HH03 61785 v. Jimenez*, 319 So. 3d 93 (Fla. 3d DCA 2021) .......................................................35

*City of Fla. City v. Pub. Risk Mgmt. of Fla.*, 307 So. 3d 135 (Fla. 3d DCA 2020).22

*Commodore, Inc. v. Certain Underwriters at Lloyd's London*, 342 So. 3d 697 (Fla. 3d DCA 2022)......................................................................... 22, 31, 34

*Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303 (7th Cir. 2021) ...........................................................................................23

*Davila v. Gladden*, 777 F.3d 1198 (11th Cir. 2015)......................................... 17, 18

*Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135 (Fla. 1998) ................................................................................... 23, 26

*Gov't Emps. Ins. Co. v. Burak*, 373 So. 2d 89 (Fla. 3d DCA 1979)................. 21, 43

*Homeowners Choice Prop. & Cas. v. Miguel Maspons*, 211 So. 3d 1067 (Fla. 3d DCA 2017)..........................................................................................39

*Hudson Ins. Co. v. Double D Mgmt. Co.*, 768 F. Supp. 1542 (M.D. Fla. 1991) ... 23, 24

*James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270 (11th Cir. 2008) ........................................................................................................ passim

*LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511 (11th Cir. 1997) ....... 23, 24

*Philip Morris Inc. v. French*, 897 So. 2d 480 (Fla. 3d DCA 2004) ................. 35, 48

*Reliance Ins. Co. v. The Escapade*, 280 F.2d 482 (5th Cir. 1960) ................... 28, 29

*SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347 (11th Cir. 2022) ............................................................................................ 39, 40

*Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 15 F.4th 398 (6th Cir. 2021) ............22

*Steuart Petroleum Co. v. Certain Underwriters at Lloyd's London*, 696 So. 2d 376 (Fla. 1st DCA 1997) .............................................................................. 22, 34, 43

*Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161 (Fla. 2003) ....... 36, 37

*Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528 (Fla. 2005) . 23, 24

*TMW Enterprises, Inc. v. Fed. Ins. Co.*, 619 F.3d 574 (6th Cir. 2010) ............ 22, 23

*Vazquez v. Citizens Prop. Ins. Corp.*, 304 So. 3d 1280 (Fla. 3d DCA 2020) ..........39

*Vyfvinkel v. Vyfvinkel*, 135 So. 3d 384 (Fla. 5th DCA 2014) ..................................53

*White Star S.S. Co. v. N. Brit. & Mercantile Ins. Co.*, 48 F. Supp. 808 (E.D. Mich. 1943) ...................................................................................................................28

## STATUTES, CONSTITUTIONAL CLAUSES, AND RULES OF COURT

28 U.S.C. § 1291 ................................................................ vii

28 U.S.C. § 1332 ................................................................ vii

Fed. R. App. P. 4(a)(4) ..................................................... vii

Fed. R. Civ. P. 56(a) ..........................................................54

## SECONDARY SOURCES

2 Arnould, Marine Insurance and Average (13th ed., Lord Chorley, 1950) ...........29

DIRECT LOSS, Black's Law Dictionary (12th ed. 2024) ......................................39

Jonathan M. Stern, *THE MANUSCRIPT POLICY: A Potential "Stuckeyville" in the Insurance World*, 47 No. 2 DRI For Def. 8 (February 2005). .........................4

REDUCE, Merriam-Webster's Collegiate Dictionary (11th ed. 2014) ..................37

## <u>STATEMENT OF JURISDICTION</u>

The district court had diversity jurisdiction over FEC's contract claims under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy is over $75,000. (D1:1–3). The court entered final judgment against FEC on February 8, 2024. (D92). FEC timely moved to alter or amend judgment on March 7, 2024, tolling the time for FEC to file an appeal under Fed. R. App. P. 4(a)(4). (D93). The court denied this motion on April 9, 2024. (D96). FEC timely filed its notice of appeal on May 6, 2024. (D97). Accordingly, the Court has jurisdiction over this final appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court erred by calculating a deductible using a presumption that FEC suffered system-wide property damage in Hurricane Irma when the parties agreed that no property damage actually occurred.

2. Whether the district court erred in failing to apply Policy clauses that insured FEC for expenses and lost revenues sustained while preventing imminent hurricane damage to insured property and reducing its ultimate losses under the Policy.

# INTRODUCTION

While Hurricane Irma, a Category 5 hurricane, prepared to strike Florida in September 2017, Plaintiff-Appellant Florida East Coast Holdings Corporation ("FEC"), owner of the Florida East Coast Railway, did exactly what its Insurers expected FEC to do: cease its normal railroad operations and remove and store roughly 600 vulnerable railroad crossing gates to protect its property, reduce its imminent losses, and improve its ability to recover quickly from the storm's devastating effects.

This effort was successful. FEC incurred relatively minimal losses from one of the most powerful and destructive hurricanes in American history, namely $2,148,690 for removal, storage, and reinstallation of its crossing gates, and $3,388,423 in lost revenues from the gates being offline.

Under the terms of FEC's all-risk insurance policy, the Insurers should have paid FEC's losses and been grateful that FEC prevented higher losses. Instead, the Insurers employed what the district court described as "mental gymnastics" to deny paying FEC anything under a novel theory that a deductible which expressly applies only when there are "locations damaged" by a hurricane still applies in the absence of any locations actually suffering damage. The Insurers then creatively utilized a statement of system-wide values FEC submitted to determine its insurance premium to calculate a deductible FEC could never meet. The district

2

court erred in finding that the Insurers' proposed interpretation of the deductible clauses was the only reasonable interpretation of the Policy.

The district court's interpretation is contrary to the plain text of the Policy, and fails to follow interpretative law by resolving multiple alleged ambiguities in favor of the Insurers rather than the insured. The Insurers' interpretation also ignores the economic reality of the situation: FEC's efforts reduced the losses incurred from the storm and saved the Insurers money, which the Policy recognized would be compensated under the Policy's sue-and-labor clauses. This interpretation disincentivizes pre-storm protective measures in favor of allowing destruction covered by the Policy, an absurd result for which neither party bargained. Accordingly, the Court should reverse the district court's summary judgment and remand for entry of judgment in favor of FEC or, alternatively, a trial on the proper amount of the deductible.

## STATEMENT OF THE CASE

## I. STATEMENT OF FACTS

FEC owns the Florida East Coast Railway, a Class II regional railway that operates a 351-mile freight rail system along the length of the east coast of Florida. *Florida East Coast Railway*, https://www.fecrwy.com/ (last visited July 17, 2024). From Jacksonville to Miami, FEC provides rail operations to support end-to-end intermodal and carload solutions to customers who need cost-effective and

premium quality transportation solutions. *Id.* FEC is the exclusive rail provider to all major south Florida ports, including PortMiami, Port Everglades and the Port of Palm Beach. *Id.* FEC has operated the sole east coast railway in Florida since its founding by Henry Flagler in 1885. About Us, *Florida East Coast Railway*, https://www.fecrwy.com/about-us/ (last visited July 17, 2024).

### A. FEC paid for broad all-risk insurance.

In 2017, FEC obtained an all-risk insurance policy ("the Policy") from Defendants-Appellees Lexington Insurance Company, Aspen Specialty, Houston Casualty, Allied World, Ironshore Specialty, and Indian Harbor (XL) (collectively, the "Insurers"). (D63-1;D64-5:1–2). The Policy consists of a manuscript policy form[2] and provides coverage for "physical loss or damage to the insured property," Time Element[3] loss (an insurance term for business interruption and related losses that accrue over the time period that insured property cannot be put to its normal

---

[2] "A 'manuscript policy' is an insurance policy that is uniquely tailored to the coverage needs of an insured, often a large commercial insured." Jonathan M. Stern, *THE MANUSCRIPT POLICY: A Potential "Stuckeyville" in the Insurance World*, 47 No. 2 DRI For Def. 8 (February 2005). "A hallmark of the manuscript policy is that it deviates from the standardized forms that are tried and tested (although not always true)." *Id.* This can create significant ambiguity when insurers alter standardized forms meant to "fit together much like a complex jig saw puzzle." *Id.* (collecting examples).

[3] "Time Element is defined as any form of revenue/income to the Insured and special coverages as described herein to include but not be limited to Business Interruption/Loss of Income, Rental Income, Contingent and/or Contributory Coverages, Extra Expense, and Service Interruption." (D63-1:37).

use), and various other miscellaneous types of losses (including fine art losses, expert and claim processing fees, and others). (D63-1:3,13–29). The Policy term ran from March 1, 2017, to March 1, 2018. (D63-1:2). The Policy limit is $25,000,000, with over twenty potentially applicable sublimits for a given claim. (D63-1:9–11).

The Policy has three primary sections: (1) "Section A" for "Declarations"; (2) "Section B" for property loss; and (3) "Section C" for Time Element loss. (D63-1:8,13,26).

Section A's Deductible clause sets forth seven possible deductibles:

> In each case of loss covered by this Policy, the Insurers will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible specified below, and only for its share of that greater amount.
>
> Unless otherwise stated below:
>
> A.    When this Policy insures more than one property, the deductible will apply against the total loss covered by this Policy in any one occurrence.
>
> B.    If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided.
>
> Policy Deductible(s)
>
> $       100,000 combined all coverages except;
> $       750,000 as respects **Railroad Operations** except;

> 5% of property values at locations damaged from and as respects **Named Windstorm**[4] including or any combination of Flood resulting from Named Windstorm subject to a minimum deductible of $750,000.
>
> $      250,000 as respects Flood except $750,000 for Flood within Zones A and V;
>
> $      100,000 as respects Earthquake;
>
> $      100,000 as respects rail flaw detection equipment;
>
> $      25,000 as respects Fine Arts;

(D63-1:13).

Notably, the Named Windstorm provision is an exception to the $750,000 amount of the Railroad Operations provision and applies when "5% of property values at locations damaged from and as respects Named Windstorm" exceeds $750,000. (*Id.*) (stating the $750,000 Railroad Operations provision applies "except" when the Named Windstorm provision applies, and ending the Named Windstorm provision with a period instead of a semicolon). The Railroad Operations provision is itself an exception to the $100,000 all coverages deductible provision and applies to losses arising out of FEC's operation of its railroad. (*Id.*)[5]

Section B describes the "Property Damage" coverage. (*Id.*) The initial all-risk "Insuring Clause" of Section B states that "[s]ubject to all terms, conditions

---

[4]      FEC does not dispute that Hurricane Irma qualified as a Named Windstorm. (*See* D63-1:49–50;D62:7–8).

[5]      For clarity, FEC refers to these clauses as the "Railroad Operations deductible" and the "Named Windstorm exception," recognizing that technically the Named Windstorm clause is an exception to an exception or sub-exception given the Policy's mechanics.

and exclusions contained herein, this policy insures against all risks of direct physical loss or damage to the insured property occurring during the policy period from any cause except as herein excluded." (*Id.*) Section B then recites numerous "Additional Coverages" purchased by FEC. (D63-1:14–24). Among these additional coverages are "Expenses to Reduce Loss" and "Protection and Preservation of Property" (the "Preservation" clause). (D63-1:20–21).

The Expenses to Reduce Loss clause, sometimes referred to by the parties as one of the "sue-and-labor" clauses, states that:

> Policy covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy, however, such expenses shall not exceed the amount by which the loss as covered by this policy is thereby reduced. It is expressly understood and agreed that any expense incurred by the Insured as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder.

(D63-1:20). The Section B Preservation clause provides in relevant part that:

> This Policy covers:
>
> 1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property.
>
> . . .

Insured Property[6] covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under this policy, and subject to the applicable deductible, sublimit of liability and policy limit.

(D63-1:21).

In addition, Section B provides for the recovery of "Professional Fees" from hiring "accountants, architects, surveyors, auditors, engineers, or other professionals" to calculate FEC's losses. (*Id.*).

Section C covers Time Element loss. Like Section B, it begins with an insuring clause providing that "[t]his Policy insures Time Element loss, as provided in the Time Element Coverages, directly resulting from physical loss or damaged of the type insured by this Policy[.]" (D63-1:26). The Section C initial insuring section also includes a separate insuring clause that provides additional "sue-and-labor" coverage (the "Section C Sue-and-Labor Clause"):

This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

(*Id.*)

Section C then lists the basic "Time Element Coverages," including "Business Interruption/Loss of Income" ("Business Interruption") and "Extra

---

[6]     Despite being capitalized, "Insured Property" is not defined in the Policy. (*See generally* D63-1).

Expense." (D63-1:26–28). The Business Interruption clause provides, in relevant part, that:

> This policy insured the necessary interruption or suspension of the Insured's operations and the consequent reduction of business income caused by or resulting from direct physical loss and/or damage by a peril not excluded by this policy occurring during the policy period to any insured property as provided herein.

(D63-1:26–27). The Extra Expense clause states, in relevant part, that:

> This policy shall insure Extra Expense which shall apply to all operations including but not limited to **Railroad Operations** of the Insured as respects losses where Insured incurs expenses over and above normal expenses in order to continue normal operations following direct physical loss and/or damage by a peril not excluded by this policy to property and/or coverages insured against occurring during the term of this policy.

(D63-1:27–28).

Section C includes a subsection for certain coverage extensions purchased by FEC, known as the "Time Element Coverage Extensions." (D61-3:29). These extensions include the "Protection And Preservation Of Property – Time Element" extension (the "Section C Preservation Extension"):

> This Policy covers the Actual Loss Sustained[7] by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this Policy at such insured property.

---

[7]    Despite being capitalized, "Actual Loss Sustained" is not defined anywhere in the Policy. (*See generally* D63-1).

9

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

(D63-1:31).

Another Section C Time Element Coverage Extension is the "Consequential Loss" extension, which provides in relevant part:

Further, in the event of loss or damage to any property by reason of any peril insured against and such damage, without the intervention of any other independent cause, results in a sequence of events which causes physical damage to other property insured by this policy, and/or the Insured sustains an interruption of business as covered hereunder, then this policy will cover such resulting loss or damage.

(D63-1:30).

The Policy also originally contained a "Conflict of Wording" clause stating that "[w]here there is a conflict between the specific sections and general conditions of this policy, the conditions of the specific section shall prevail." (D63-1:43). Endorsement 17 "deleted" this clause. (D63-1:75).

FEC paid the Insurers a premium of $552,609 in exchange for this comprehensive coverage. (D63-1:2). "The premium for this Policy is based on the statement of values provided to the Insurer(s) by or on behalf of the Insured and kept on file by the Insurer(s)." (D63-1:73). This statement of values is a single sheet document listing fourteen general categories of property with individual monetary valuations like "Automatic Crossings" (listed at $219,019,894), "Electronics" (listed at $10,455,027), and "Bridges" (listed at $338,589,427).

(D64-2:422). The statement also listed a combined "Property Values Total" of $725,654,663 and a twelve-month "Business Interruption Values" of $98,786,145. (*Id.*)

**B.    FEC incurs expenses in taking action to reduce its Irma losses.**

On August 30, 2017, Hurricane Irma formed off the coast of Cape Verde. (D64-5:3). Irma grew into a deadly Category 5 hurricane as it moved in a northwesterly direction towards North America. (*Id.*). FEC tracked the storm and determined that Irma would strike Florida's coast, placing FEC's railroad operations in imminent danger. (*Id.*) In accordance with longstanding FEC operational procedures, the sue-and-labor clauses of the Policy, prudence, and common sense, FEC acted before the storm made landfall in Florida to reduce its imminent losses. (*Id.*)

Having experience with the danger and potential for catastrophic damage presented by unsecured railway crossing gates, FEC dispatched crews on September 7, 2017, to unbolt, remove, and store roughly 600 of these crossing gates, a process that took multiple days and crews deployed across the entire rail system potentially impacted by Irma. (*Id.*) Without these crossing gates, trains had to run at 10 mph instead of 60 mph as a safety precaution in these areas. (D64-5:4). In some cases, the trains had to stop completely at crossings so the conductor could serve as a flagman to safely control the crossing. (*Id.*)

While these actions were costly and caused significant lost revenues, they prevented substantially greater losses that could have resulted from the storm. (D61-29:11). As FEC's expert later explained, this process "avoids the losses associated with predicted wind shear damage, sidesteps possible injury if the aluminum gates were sheared and became like airborne helicopter blades, and avoids extended business interruption during the fabrication of new gates and the gate re-installation process." (*Id.*) "If [FEC] chanced that gates would not be impacted in a given storm, and those gates were in fact sheared or damaged, then the losses to [FEC] and its Insurers could be greatly increased versus its pre-preparation." (*Id.*)

On September 10, 2017, Irma made landfall in Florida. (D64-5:4). After the storm passed, FEC restored the gates and its normal railroad operations as quickly as possible. (*Id.*) Reinstalling the gates took roughly three times longer than removing them due to logistical and safety issues. (D61-29:11). All told, FEC's railroad operations were slowed or shut down from September 7 until September 18, 2017 as a consequence of the removal of the crossing gates. (D64-5:4). FEC timely informed the Insurers of its losses on September 15, 2017. (D63-2:2).

### C.    The Insurers pre-deny FEC's claims pre-submission.

Robert Steller, the Insurers' claims adjuster, coordinated the Insurers' response to FEC's losses. (D64-2:11–12). In the months following Irma, Steller

communicated with the Insurers' representatives about FEC's losses. (*E.g.*, D64-2:423–430). During these communications, some Insurers argued that the Named Windstorm exception (i.e., "5% of property values at locations damaged") applied to all Irma losses even without locations damaged, and that this exception should be calculated based on the statement of values' schedule for all property in a given category (here, the $219,019,894 value for "Automatic Crossings" and $98,786,145 in total "Business Interruption" categories) even without the presence of property damage. (*Id.*).

Steller initially questioned this position, asking "Perhaps the deductible only applies to PD?"[8] and "if I'm even approaching this correctly." (D64-2:428). When FEC disputed the applicability of a Named Windstorm exception during the parties' initial informal discussions, Steller polled the Insurers to determine their "formal position" on the deductible. (D64-2:427). Although not every Insurer appears to have responded to Steller's inquiry, he ultimately moved forward with the theory advanced by some Insurers that the Named Windstorm exception applied to increase the applicable Railroad Operations deductible and should be calculated using 5% of system-wide "property values" listed in the statement of values even though there were no actual "locations damaged." (D64-2:423–426).

---

[8]    "PD" refers to "property damage." (D64-2:267).

Consequently, Steller sent FEC a letter on December 7, 2017, contending that FEC's claimed losses fell below the applicable deductible. (D64-2:433–434). Steller sent this letter before FEC even formally submitted its claim. (D64-2:431–432). As FEC noted in its response to this letter, the Insurers effectively denied FEC's claim pre-submission in reliance upon a novel reading of the Named Windstorm exception without any attempt to confer with FEC. (*Id.*)

FEC pressed forward with its claim, making a formal submission and undergoing the claim adjustment process. (D63-4). FEC retained accounting firm Pyxis Group, LLC ("Pyxis") to analyze FEC's losses. (D63-4;D61-29:6). Pyxis determined that FEC paid $2,148,690 to reduce its losses from Hurricane Irma, including the costs of removing, storing, and reinstalling its crossing gates. (D63-4:2). Pyxis also determined that FEC suffered $3,388,424 in lost or interrupted business between September 7 and 18 from slowing or stopping its railroad operations as a consequence of the storm and removing the gates. (*Id.*) Pyxis reached this number using a year-over-year comparison methodology. (D61-29:10–12). Pyxis's professional fees totaled $68,768. (D63-4:2).

Combining these figures together, Pyxis calculated FEC's total covered losses from Irma to be $5,605,881. (*Id.*) After applying a $750,000 deductible, Pyxis concluded that the Insurers owed FEC $4,885,881. (*Id.*) The Insurers hired

their own accounting firm, Matson, Driscoll & Damico LLP, that substantially confirmed these calculations. (D61-29:16–18).

Three years later, the Insurers issued a denial letter on December 2, 2020. (D64-2:600–601). This letter accepted FEC's valuation of its losses, but claimed they were below the deductible the Insurers calculated using the presumption of locations damaged and the Named Windstorm exception. (*Id.*) Although FEC disputed the letter, this denial effectively ended the claims adjustment process. (*See* D61-28:1–10).

## II.  COURSE OF PROCEEDINGS

After this denial, FEC sued the Insurers for breaches of the Policy's coverage and deductible provisions. (D1). Following discovery, the parties cross-moved for summary judgment on FEC's claims. (D61;D62;D71;D72;D76;D80).

FEC argued that its losses were covered by the sue-and-labor, Business Interruption, and Extra Expense clauses, that the Named Windstorm exception could not apply without locations damaged, and that the $750,000 Railroad Operations deductible applied and was met. (D62;D72;D80).

The Insurers argued that only the Preservation clauses covered FEC's losses, that these clauses require the calculation of a deductible amount greater than $750,000 under the Named Windstorm exception even in the absence of "locations damaged," that this exception should be calculated based on 5% of the system-

wide value of the systems that FEC took steps to protect when removing the crossing gates (rather than 5% of property values "at locations damaged from and as respects Named Windstorm"), and that FEC's claims thus fell below the deductible. (D61;D71;D76). As part of this argument, the Insurers calculated the deductible based on the statement of values that FEC had submitted to determine the Policy's premium. (*Id.*) The Insurers also argued that the Section C Preservation Extension limits recovery for business interruptions under these facts to the 48 hours before and after FEC takes action to protect its property. (D61:18).

The district court granted the Insurers' summary judgment motion and denied FEC's. (D91). The court found that only the Preservation clauses covered FEC's losses. (D91:10). The court held that the Business Interruption and Extra Expenses clauses did not apply because there was no "direct physical loss and/or damage by a peril." (D91:10–11). The court also determined that the Expenses to Reduce Loss clause could not apply without rendering the Preservation clause "superfluous," and that this clause "involves reduction—not prevention—of loss." (D91:11). The court did not analyze, or even discuss, the Section C Sue-and-Labor Clause though FEC raised that clause in its complaint, summary judgment briefing, and oral argument on the summary judgment motions. (*See* D91;D1:11;D62:23;D87:23).

The district court concluded that language in the Preservation clauses required the application of the Named Windstorm exception "even without actual property damage." (D91:11–13). The court calculated this deductible as $10,950,994, or 5% of the $219,019,894 total system-wide value of the automatic crossing systems as listed in the statement of values, while summarily dismissing any alternative calculation in a footnote. (D91:13). The court also determined that FEC had coverage for $1,291,823 in business interruptions (*i.e.*, the business lost between September 7 and September 9, 2017) instead of $3,388,424 (*i.e.*, the total business lost between September 7 and September 18, 2017) under the Section C Preservation Extension. (D91:14). The court thus found that FEC's covered losses did not meet the deductible and granted summary judgment for the Insurers. (D91:15;D92). The court closed by lamenting that the Policy required "mental gymnastics" to "determine coverage." (D91:15).

FEC moved to amend the judgment on March 7, 2024. (D93). The district court summarily denied this motion without further analysis. (D96). This timely appeal followed. (D97).

## III.   STANDARD OF REVIEW

This Court reviews summary judgment orders *de novo*. *Davila v. Gladden*, 777 F.3d 1198, 1203 (11th Cir. 2015). The Court must "view the evidence and all

factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Id.*

The parties agree that Florida law governs this dispute. (*See* D61:14;D91:7–8). "The interpretation of provisions in an insurance contract is a question of law reviewed *de novo*." *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008).

## SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment to the Insurers. The decision below rests on three fundamentally flawed conclusions, each of which must be affirmed for the district court's decision to stand. If this Court disagrees with any one conclusion, the district court's judgment must be reversed.

First, the district court erred in determining the appropriate deductible. Because FEC's losses involve its railroad operations, the $750,000 Railroad Operations deductible applies. Under the Policy's plain language, the Named Windstorm exception to the Railroad Operations deductible cannot increase the amount of this deductible without "locations damaged," and no locations were damaged here.

Second, the district court erred in determining the relevant coverage clauses for FEC's claimed losses. Contrary to the district court's opinion, the sue-and-labor clauses provide coverage for FEC's claimed losses. Sue-and-labor clauses are an

ancient insurance concept requiring insurers to reimburse insureds for expenses necessarily incurred to reduce imminent loss. The Policy's sue-and-labor clauses cover expenses FEC necessarily incurred to prevent and reduce the imminent and inevitable losses from Hurricane Irma.

The district court denied sue-and-labor coverage for FEC because it reasoned that any interpretation of the clauses that provided coverage for pre-storm expenses would render the Preservation clauses superfluous. This reasoning is inherently flawed, and the district court did not look beyond the instant claim to determine how its interpretation would work for other claims and fact patterns. In so doing, the district court missed the import of the savings requirement and how the sue-and-labor clauses serve distinct purposes apart from the Preservation clauses. Courts have long recognized that the surplusage canon must be applied with special care to the interpretation of insurance contracts given their iterative and often redundant and overlapping nature. Here, while the sue-and-labor and Preservation clauses may provide redundant and overlapping coverage under the facts of a given claim, each serve independent and intended purposes for the Policy as a whole. The district court (and the Insurers') interpretation of the Policy would incentivize the insured to stand idly by rather than take proactive measures to protect property. This is neither the best nor the only possible reasonable interpretation of the Policy. Because FEC's losses are independently covered by

other clauses, any effect that the Preservation clauses might otherwise have on the deductible is simply not relevant or decisive to the specific claim at issue in this appeal.

The Business Interruption and Consequential Loss clauses provided coverage for FEC's lost revenues directly resulting from the steps it took to protect its crossing gates and to return to normal operations as expeditiously as possible. Moreover, the Preservation clauses did not require an enhanced deductible of over $750,000 and provided redundant coverage for FEC's losses.

Finally, the district court erred in concluding the specific language of each Preservation clause separately required the court to calculate the deductible under the Named Windstorm exception under a presumption of "locations damaged" and system-wide property values. It did so notwithstanding the fact that FEC never claimed coverage under the Preservation clauses. Regardless, neither clause requires the type of mental gymnastics the court lamented.

Even if the Policy could be read to require the parties to pretend there were "locations damaged" when calculating the applicable deductible for FEC's claim, there is nothing in the Policy identifying what locations should be treated as damaged. Instead, the language of the Policy requires an individualized assessment of "property values at locations damaged from and as respects a Named Windstorm," not a system-wide assumption that every possible location was

damaged. There is also no predicate for using FEC's pre-Policy statement of values that was intended to be used to calculate the Policy premium, not some deductible based on a fiction of system-wide damages. The Insurers never identified the locations the parties should pretend were damaged under their reading of the deductible clauses, nor which locations would have been damaged by Hurricane Irma without FEC's protective actions. Should the Court agree with the Insurers' interpretation for any aspect of FEC's claim, the case must be reversed and remanded to the district court for trial to resolve this issue of fact.

## ARGUMENT

The district court erred by entering summary judgment for the Insurers. Under well-settled, controlling principles of Florida law and the plain language of the Policy, the Railroad Operations deductible of $750,000 applied to FEC's claim and cannot be increased by the Named Windstorm exception in the absence of any locations suffering damage from Hurricane Irma. Moreover, FEC's losses were covered by the specific clauses that it invoked below. This Court should reverse.

## I. PRINCIPLES OF FLORIDA INSURANCE LAW FAVOR FEC'S INTERPRETATION AND SUPPORT COVERAGE.

Florida law has a robust set of interpretive principles that apply to insurance contracts. Those principles broadly favor the insured, and several control here.

First, when overlapping coverages exist, Florida law is clear that "the one affording greater coverage will prevail." *Gov't Emps. Ins. Co. v. Burak*, 373 So. 2d

89, 90 n.2 (Fla. 3d DCA 1979) (collecting cases); *Steuart Petroleum Co. v. Certain Underwriters at Lloyd's London*, 696 So. 2d 376, 379 (Fla. 1st DCA 1997) (same). Thus, if two clauses provide coverage for the same loss, and one requires a higher deductible, Florida law permits the insured to claim under the clause with the greater coverage or lower deductible to maximize its recovery. *Id.*

Second, Florida courts "read each [insurance] policy as a whole, endeavoring to give every provision its full meaning and operative effect." *City of Florida City v. Pub. Risk Mgmt. of Fla.*, 307 So. 3d 135, 138 (Fla. 3d DCA 2020) (citation omitted). Although Florida courts apply the canon against surplusage, it is not implicated when terms or clauses "can reasonably be interpreted to cover different scenarios" that an insurance policy is designed to cover. *Commodore, Inc. v. Certain Underwriters at Lloyd's London*, 342 So. 3d 697, 703 (Fla. 3d DCA 2022). Just because an interpretation may render the language of a clause redundant and irrelevant under one set of claim facts, does not make it surplusage when there are myriad fact patterns where the language would apply. *Id.*

Courts have long recognized that the surplusage canon must be applied with special care to insurance contracts. As one court put it, "[t]he canon needs to be deployed with special care in a setting—insurance contracts—in which 'redundancies abound' and particularly in a 26-page contract in which 'iteration is afoot throughout.'" *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 15 F.4th 398, 405–

06 (6th Cir. 2021) (quoting *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010)). That is because insurance contracts are often comprised of a mix of boilerplate and negotiated clauses, so "insurance policies often use overlapping provisions to provide greater certainty on the scope of coverages and exclusions." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 311 (7th Cir. 2021).

Third, "insurance contracts are construed according to their plain meaning." *James*, 540 F.3d at 1274 (quoting *Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005)). However, "[a]mbiguities in policy language 'are construed against the insurer' in favor of coverage." *Id.* at 1274 (quoting *Deni Assocs. of Fla. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1140 (Fla. 1998)); *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) ("Ambiguous policy provisions are interpreted liberally in favor of the insured and strictly against the drafter who prepared the policy."). "A contract provision is considered ambiguous if the 'relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage.'" *James*, 540 F.3d at 1274 (quoting *Taurus*, 913 So. 2d at 532) (alterations and citations omitted).

Finally, "[t]he burden of proving an exclusion to coverage is on the insurer." *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997)

(citing *Hudson Ins. Co. v. Double D Mgmt. Co.*, 768 F. Supp. 1542, 1545 (M.D. Fla. 1991)). When an insurer includes language that takes away from coverage, such exclusionary clauses are to be strictly construed against the insurer. *See id.*; *Taurus*, 913 So. 2d at 532.

## II.   FEC'S COVERED LOSSES EXCEED THE CORRECT DEDUCTIBLE.

### A.   The $750,000 Railroad Operations deductible applies.

A Railroad Operations deductible of $750,000 applies to FEC's claimed losses because they clearly pertain to Railroad Operations and the product of the formula "5% of property values at locations damaged from" Irma does not exceed $750,000.

The deductible provisions of the Policy specify seven potentially applicable deductibles for any claim: (1) a generally applicable $100,000 deductible "combin[ing] all coverages"; (2) a $750,000 exception to that general deductible "as respects Railroad Operations"; (3) a sub-exception to the Railroad Operations clause for "5% of property values at locations damaged from and as respects Named Windstorm including or any combination of Flood resulting from Named Windstorm subject to a minimum deductible of $750,000"; and (4) four possible miscellaneous deductibles specific to flood, earthquake, rail flaw detection equipment, and fine arts. (D63-1:13). The structure of this Policy clause makes plain that the general $100,000 deductible provision applies, "except" where a

more specific deductible provision controls. Thus, the question for the Court is which deductible best fits the loss claimed by FEC. If there is any doubt, this Court must choose the interpretation that maximizes coverage for FEC. *James*, 540 F.3d at 1274.

The claimed losses all arise out of FEC's Railroad Operations. "Railroad Operations" means the "operation of rolling stock, locomotives, including but not limited to foreign line rolling stock, bridges, tunnels, culverts, track and roadbed and bills of lading." (D63-1:50). The crossing gates at issue are plainly crucial components of FEC's Railroad Operations and fall squarely within this definition. FEC can only run trains at 10 mph instead of the normal 60 mph without them, a fraction of its normal capacity. (D64-5:4). FEC's claims under the Policy arise directly from the impairment of Railroad Operations: expenses to remove and preserve the crossing gates, expenses to keep the railway running at reduced capacity, the loss of revenue and other business expenses following from operations at reduced capacity, and expenses to restore the railway to full operations. Therefore, the Railroad Operations deductible applies, and the analysis turns to whether the deductible amount is $750,000 or some higher amount under the Named Windstorm exception.

That key question for this inquiry is whether "*5% of property values at locations damaged* from and as respects Named Windstorm" exceeds $750,000

(D63-1:13) (emphasis added). If not, then the deductible remains at $750,000 as the language is clear that the "5% of property values" formula is "subject to a minimum deductible of $750,000." (*See id.*) The Policy cannot be clearer: no "locations damaged from" a Named Windstorm, then no increase to the $750,000 Railroad Operations deductible from the Named Windstorm exception. This is the only reasonable interpretation of the Named Windstorm exception.

Even if the Insurers could counter with their own "reasonable" interpretation, their efforts would be futile. Florida law is clear that when "relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the other limiting coverage," the proper resolution is to construe the clause "against the insurer in favor of coverage." *James*, 540 F.3d at 1274 (quoting *Deni*, 711 So. 2d at 1140). This rule of construction requires the Court to adopt FEC's reasonable interpretation of the Named Windstorm exception in this context.

The Insurers' own adjuster, Steller, implicitly recognized the reasonableness of FEC's interpretation during the initial review of the Named Windstorm exception. A seasoned claims adjuster attempting to limit coverage does not question whether a "deductible only applies to [property damage]" or if he is "even approaching this correctly" unless he has serious doubt about the clarity of the Policy language and the merit of his position. (D64-2:428). Nor does he poll the

Insurers for a "formal position" on a deductible unless there are multiple potential positions to take. (D64-2:427). When the Insurers' own appointed claims adjuster concedes that FEC's proposed interpretation of the Named Windstorm exception is a reasonable interpretation, then the interpretation is well within the bounds of reason.

The Court must read the Policy (and any alleged ambiguities) to maximize FEC's coverage. *James*, 540 F.3d at 1274. As FEC claimed no property damage from Hurricane Irma—and so had no "locations damaged from" Irma—due to its proactive measures to reduce loss, the Named Windstorm exception cannot apply to increase the deductible applicable to FEC's claimed losses.

### B. The sue-and-labor clauses cover FEC's $2,148,690 in protective expenses.

The expenses FEC incurred to reduce its losses by moving its crossing gates out of Hurricane Irma's path, keep railroad operations running to the extent possible, albeit below full capacity, and restore the railroad to its normal operating conditions are covered under the sue-and-labor clauses of the Policy, *i.e.*, the Section C Sue-and-Labor clause, and the Section B Expenses to Reduce Loss clause. It is undisputed that FEC's expenses in removing, storing, and reinstalling its crossing gates reduced its losses and saved the Insurers substantial amounts—far more than the expenses FEC now seeks to recover under the Policy. These are precisely the type of expenses covered by the two sue-and-labor clauses. The

district court failed to address the Section C Sue-and-Labor clause in its summary judgment order, misapplied key clauses of the Section B Expenses to Reduce Loss clause that differentiate it from the coverage provided by the Section B Preservation clause, and did not adhere to fundamental insurance policy construction rules in erroneously finding that FEC's expenses were not covered by the Policy's sue-and-labor clauses.

Sue-and-labor clauses are an "ancient" concept dating back to at least 1613 with roots in maritime insurance. *See Reliance Ins. Co. v. The Escapade*, 280 F.2d 482, 488 n.11 (5th Cir. 1960). This Court's predecessor explained the "history, function and purpose" of sue-and-labor clauses as follows:

> Since an assured has the duty toward his underwriter to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy, the clause undertakes to reimburse the assured for these expenditures which are made primarily for the benefit of the underwriter either to reduce or eliminate a covered loss altogether.

*Id.* at 488.

"[T]he purpose of the clause is at least twofold." *Id.* at 488 n.11. "It 'is to (a) encourage and (b) bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss." *Id.* (quoting *White Star S.S. Co. v. N. British & Mercantile Ins. Co.*, 48 F. Supp. 808, 813 (E.D. Mich. 1943)).

"Prevention of loss is the very object in view. It contemplates the benefit of the insurers only." *Id.* (quoting 2 Arnould, Marine Insurance § 871 at 795 (1950)).

At a minimum, a sue-and-labor clause means to an insured that "if a storm is coming, secure the boat." *See id.* at 484 n.4 (sue-and-labor language requires insured to act for the "defense, safeguard and recovery of the said vessel"). Likewise, if a hurricane is bearing down on Florida and is going to wreak havoc on insured railroad equipment, the insured railroad has a duty to reduce the loss its equipment is about to experience. This is the basic, core insurance concept of reducing imminent losses. An insured is not required to wait for a storm to hit before taking precautions.

Under the Policy, when an insured's pre-storm actions are successful and result in savings to its insurers, the insurers have a duty to reimburse the insured for the expenses incurred in protecting their interests. At their essence, the Policy's sue-and-labor clauses incentivize insured parties to proactively protect their property, reduce their insurable losses and save insurers money by promising to reimburse the expenses "reasonably and necessarily" incurred in that effort. This type of "you scratch my back, and I will scratch yours" tradeoff is the guiding principle for the sue-and-labor clauses in the Policy. Any interpretation that limits the coverage provided by such a sue-and-labor clause to only post-storm expenses is *per se* unreasonable.

The Policy's Section C Sue-and-Labor Clause reimburses "expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced." (D63-1:26). Likewise, the Section B Expenses to Reduce Loss clause "covers such expenses are as necessarily incurred for the purpose of reducing any loss under this policy; however, such expenses shall not exceed the amount by which the loss as covered by this policy is thereby reduced." (D63-1:20). The latter further provides that "[i]t is expressly understood and agreed that any expense incurred by the Insured as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder." (*Id.*)

These clauses are classic sue-and-labor clauses, grounded in the well-developed insurance principles of old, and are intended to encourage FEC to save the Insurers money by preventing even greater destruction that the Insurers would then have to cover. These clauses are purposefully built for what occurred here: FEC "reasonably and necessarily incurred" expenses "for the purpose of reducing any loss under this policy," *i.e.*, the property damage and lost business which would have occurred had Irma destroyed FEC's crossing gates. On their plain language, and on well-settled insurance law, these clauses plainly cover FEC's protective expenses.

The district court erred in rejecting FEC's reliance on the Section B Expenses to Reduce Loss clause because its view was neither the best nor the only reasonable interpretation of the clause. The court reasoned that the Expenses to Reduce Loss clause does not cover FEC's claimed losses because "that clause explicitly involves reduction—not prevention—of loss" and "[t]o treat 'reduce' and 'prevent' interchangeably would render the 'Protection and Preservation of Property' clauses superfluous." (D91:11). The court did not address the Section C Sue-and-Labor Clause, which suggests the district court may have failed to account for the ambiguities and overlapping coverages in the Policy. (*See generally* D91). The district court's conclusion is also at odds with well settled core principles of insurance contract interpretation and the plain meaning of the Policy clauses.

The district court's surplusage argument is incorrect. The Policy can be interpreted to give each of the Policy's clauses "independent operation." *Commodore*, 342 So. 3d at 703. The Preservation and sue-and-labor clauses differ in two key respects: (1) the recoverable amount, and (2) the type of expenses covered.

First, by their very nature, the sue-and-labor clauses cover losses only to the extent FEC saved the Insurers money, whereas the Preservation clauses are not so limited. Both sue-and-labor clauses include a savings clause limiting coverage to the amount by which the losses are reduced. (D63-1:20) ("[S]uch expenses shall

not exceed the amount by which the loss as covered by this policy is thereby reduced."); (D63-1:26) ("The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.").

By contrast, the Preservation clauses lack any similar limiting language. (*See* D63-1:21;D63-1:31). Although the Preservation and sue-and-labor clauses have some similarities, with both providing similar coverage which may overlap depending on the circumstances of a given claim, the savings language in the sue-and-labor clauses means that, depending on the claim, the scope of coverage for each clause may differ.

Comparing the facts here to a hypothetical storm illustrates this principle. Here, Hurricane Irma hit Florida but did not cause property damage thanks to FEC's protective measures. FEC incurred $2,148,690 in expenses removing and reinstalling its crossing gates and another $3,388,423 in lost revenues from the interruption to its business. The resulting savings to the Insurers far exceeded FEC's expenses and are thus covered by the sue-and-labor clauses.

If, however, Hurricane Irma had veered sharply away from the Florida coast at the last minute and missed FEC's locations entirely, then FEC would have still incurred the same reasonable expenses preparing for Irma but would have no savings to show for those expenses. At that point, FEC's only viable claim for coverage would arise under the Preservation clauses, not the sue-and-labor clauses

(unless FEC could engage in the fiction of "presumed" savings just as the Insurers are engaging in the fiction of presumed "locations damaged" on this claim).

Second, the Policy's clauses address different types of loss—property damage and consequential damage. On the one hand, the Preservation clauses cover "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured *property*" and "reasonable action for the temporary protection and preservation of *property* insured." (D63-1:21,31) (emphasis added).

By contrast, the sue-and-labor clauses cover a broader range of expenses than the Preservation clauses. This is to be expected given that the savings requirements of the sue-and-labor clauses govern the amount of any claim made under them. The sue-and-labor clauses state that the "Policy covers such expenses as are necessarily incurred for the purpose of reducing *any loss* under this policy" and the "Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the *loss* otherwise payable under this section of this Policy." (D63-1:20, 26) (emphasis added). These clauses are not limited to expenses incurred to temporarily protect physical property. Indeed, the reference to losses "otherwise payable under this section of Policy" include the Business Interruption and Extra Expenses, which cover "the necessary interruption or suspension of the Insured's operations and the consequent reduction of business income" and "all operations including but not limited to **Railroad Operations** of the Insured as respects losses

where Insured incurs expenses over and above normal expenses in order to continue normal operations," respectively. (D63-1:26-28).[9]

Given these fundamental differences in the function of each of these clauses, the district court erred by reasoning that FEC's interpretation of the sue-and-labor clauses would somehow render the Preservation clause superfluous. Overlapping coverage is not superfluous coverage, even if one clause may subsume another in a given fact pattern. Here, the sue-and-labor and Preservation clauses in which they appear serve different—albeit overlapping—purposes. These independent purposes foreclose application of the surplusage canon. *Commodore*, 342 So. 3d at 703.

The district court erred by focusing on the similarity between several clauses while neglecting to give effect to Florida's rule that "when two provisions in an insurance policy deal with the same subject matter, the one affording greater coverage will prevail." *Steuart*, 696 So. 2d at 379. Because the Expenses to Reduce Loss clause provides the greatest coverage on this particular claim—to include actions to reduce "any loss"—it controlled the coverage determination. The district court erred in denying FEC coverage under that clause.

---

[9]     Further, combining the broad coverage language of the Section C Sue-and-Labor Clause with the Consequential Loss clause of the Policy demonstrates the Policy covered both FEC's claimed expenses and FEC's lost business revenues incurred as a result of the action taken to reduce its losses.

The district court's surplusage reasoning is also inconsistent with the deletion of the Conflict of Wording clause. (D63-1:75). The Policy intentionally disavowed the interpretive principle that specific language controls over general language in the Policy by deleting this clause. (*Id.*). Under Florida law, endorsements control over the body of the policy and every contract clause must be given effect if possible. *Certain Underwriters at Lloyd's, London, Subscribing to Pol'y No. HH03 61785 v. Jimenez*, 319 So. 3d 93, 94 (Fla. 3d DCA 2021) ("The law in Florida is clear that to the extent an endorsement is inconsistent with the body of the policy, the endorsement controls." (citation omitted)); *Philip Morris Inc. v. French*, 897 So. 2d 480, 488 (Fla. 3d DCA 2004) ("Courts are required to construe a contract as a whole and give effect, where possible, to every clause of the agreement."). The only way to give effect to Endorsement 17's deletion of the Conflict of Wording clause is to not apply the specific language controls over general language principle when interpreting the Policy—otherwise, the deletion would have no effect. Whether the Preservation clauses cover FEC's protection and preservation expenses more specifically than the sue-and-labor clauses or the Business Interruption clause is thus irrelevant.

Neither the Insurers nor the district court cited any hurricane related cases to support the novel suggestion that expenses incurred to reduce imminent loss from an approaching storm are not covered under Florida law. (*See generally*

D91;D61;D71;D76). Without any legal support or on-point case, the Insurers in the proceedings below attempted to equate dissimilar design claims to FEC's claimed losses. The Insurers suggested an analogy with design defects in a building under construction posing an attenuated risk of structural damage at some unknown time in the future. (D61:22–24). But this is simply not analogous to the fully realized near certainty of an approaching major hurricane.

The Insurers argued the Florida Supreme Court held in *Swire* that sue-and-labor clauses "to reduce loss" do not cover expenses "to prevent loss." (D61:22–24) (citing *Swire Pacific Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 169 (Fla. 2003)). But *Swire* did not address whether expenses incurred to reduce an imminent loss were covered by a "to reduce loss" sue-and-labor clause. *Swire*, 845 So. 2d at 163–70. Nor was that court asked to interpret a sue-and-labor clause analogous to the one in the Policy. *Id*. The *Swire* clause was prefaced with "[i]n case of loss or damage" and did not use the "to reduce loss" language at issue here. *Id.* at 169. *Swire* merely held that sue-and-labor clauses do not cover expenses incurred to prevent a loss which may occur at some undefined point in the future (*i.e.*, a building collapse due to a design defect). *Id.* (observing that sue-and-labor clauses typically apply when "a covered loss had already occurred or was in the process of occurring, and the insureds were attempting to be reimbursed under the theory that they had mitigated further loss"). There is no danger of loss more

imminent in Florida than a catastrophic hurricane about to make landfall. *Swire* has no applicability to this case.

The steady and sure approach of Hurricane Irma guaranteed that FEC would suffer losses. (D61-29:11). By taking protective actions pre-storm, FEC reduced (*i.e.*, diminished) the extent of these losses. *See* REDUCE, Merriam-Webster's Collegiate Dictionary (11th ed. 2014) ("to diminish in size, amount, extent, or number"). FEC proposed that such expenses were covered by the sue-and-labor clauses and submit that its interpretation is, at the very least, a reasonable reading of a policy that was specifically designed to provide coverage for hurricane-related expenses and damages.

## C. The Business Interruption and Consequential Losses clauses cover $3,388,423 of FEC's lost revenues.

FEC's lost revenues as a consequence of its sue-and-labor efforts are recoverable under the Business Interruption and Consequential Loss clauses. The plain language of both clauses unambiguously covers consequential revenue loss arising from a covered peril like Hurricane Irma and the actions taken by FEC to reduce its losses from the storm. The district court's contrary conclusion rested on a flawed understanding of losses covered by the Policy.

The Business Interruption clause covers the lost income from the operational slowdowns necessitated by actions like those undertaken by FEC here: the removal, storage, and reinstallation of FEC's crossing gates. The clause covers

"the necessary interruption or suspension of the Insured's operations and the consequent reduction of business income caused by or resulting from direct physical loss and/or damage by a peril not excluded by this policy occurring during the policy period to any insured property as provided herein." (D63-1:26–27). All that is required for the coverage to apply is that the losses arise from "necessary interruption" of railway operations "resulting from direct physical loss and/or damage." The Policy covers FEC's economic losses "for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred."

FEC's removal, storage, and reinstallation of the crossing gates was clearly a "necessary interruption" of its railway operations to prevent greater losses from Hurricane Irma. FEC's physical alteration of the crossing gates in response to Irma meant that the railways could not operate as efficiently (if at all) as they did before the hurricane's landfall until the gate crossings were restored to normal operating condition and the signals reintegrated. Both sides' experts had no difficulty determining this economic loss by measuring the dip in FEC's operations from the affected period (September 7 to September 18) against previous year-over-year data. Business Interruption clauses like the one contained in the Policy exist to cover the insured from experiencing precisely this type of shortfall.

The district court determined that FEC's losses were not covered under the Business Interruption clause because it was "contingent on 'direct physical loss and/or damage'" and, in its view, "Hurricane Irma caused no direct physical loss or damage." (D91:10–11). That was wrong, in part. Although FEC's efforts may have prevented any direct physical "damage" from Irma, FEC plainly suffered direct physical "loss." Direct physical "loss" includes costs resulting from physical intervention and alteration of the crossing to avoid property damage and additional loss under the Policy. *See* DIRECT LOSS, Black's Law Dictionary (12th ed. 2024) ("A loss that results immediately and proximately from an event."). By their very nature, preventative measures are protective of the Insurers, and necessary to "prevent immediately impending, insured direct physical loss or damage" to insured property.

This understanding accords with Florida law. In Florida, courts interpret "a 'loss' [a]s the diminution of value of something," and the modifiers "direct" and "physical" "impose the requirement that the damage be actual." *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London,* 32 F.4th 1347, 1359–60 (11th Cir. 2022) (quoting *Homeowners Choice Prop. & Cas. v. Miguel Maspons*, 211 So. 3d 1067, 1069 (Fla. 3d DCA 2017)); *see Vazquez v. Citizens Prop. Ins. Corp.*, 304 So. 3d 1280, 1284 (Fla. 3d DCA 2020) (same). Although "[i]ntangible or incorporeal" loss does not qualify as "physical," a "material alteration of the

insureds' properties" will suffice. *SA Palm Beach*, 32 F.4th at 1358, 1361 (interpreting Florida law); *see Azalea, Ltd. v. Am. States Ins. Co.*, 656 So. 2d 600, 602 (Fla. 1st DCA 1995) (holding that an insured sustained direct physical loss when vandals dumped an unknown substance into a sewage treatment facility killing a bacteria colony that was "an integral part" of insured property).

FEC's railroad operations indisputably suffered from train speed disruptions and reduced revenues for the period when the gate crossings were not operational. This interruption arose as a direct consequence of FEC's "material alteration" of insured property to avert loss, which would not have occurred but for Hurricane Irma. That is direct physical loss for purposes of triggering Business Income coverage for all $3,388,423 of FEC's lost revenues.

Additionally, the Consequential Loss extension extends the coverage provided by the sue-and-labor clauses to those same lost revenues. The Consequential Loss extension provides in pertinent part that "in the event of loss or damage to any property by reason of any peril insured against. . . *and/or* the Insured sustains an interruption of business as covered hereunder, then this policy will cover such resulting loss or damage." (D63-1:30) (emphasis added). Under this extension, "such resulting loss" for FEC is the business interruptions and slowdowns that FEC experienced as a direct result of removing its crossing gates to protect its property as Hurricane Irma approached. As set forth *supra* Part II.B,

such expenses are "loss" covered by the Section C Sue-and-Labor clause. The effect of the Consequential Loss clause is to extend coverage to resulting losses caused by the initial loss. To give effect to this extension, the resulting losses to which coverage is extended may be losses not already covered by the Policy. Here, FEC incurred a "loss" in taking actions under the sue-and-labor clauses to remove its crossing gates, and then experienced consequential loss in the form of business interruptions and slowdowns until the gates could be restored. The Consequential Loss extension demonstrates the Policy was always intended to cover FEC's "resulting loss," *i.e.*, its lost business, under these facts.

**D.      The Professional Fees clause covers FEC's $68,768 in Pyxis fees.**

The Professional Fees clause covers FEC's $68,768 in Pyxis fees. The clause "covers the actual costs incurred by the Insured payable to accountants . . . for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Insurers[.]" (D63-1:21). The Insurers required FEC to prove its claimed losses from Irma, and this proof required FEC to retain accounting firm Pyxis. (*See* D63-4). Accordingly, FEC's Pyxis fees are covered by the Policy "subject to the deductible that applies to the loss." (D63-1:21).

### E. The Preservation clauses do not require the application of a deductible over $750,000.

The district court concluded that the Policy covered FEC's losses under only the two clauses advanced by the Insurers—the Sections B and C Preservation clauses. (D91:10–13). The court then used the language of each Preservation clause to increase the amount of the applicable deductible from $750,000 to $10,950,994.70 regardless of which clause applied. (D91:13–14).

For the Insurers to succeed in this appeal, the Insurers must defend both facets of the district court's summary judgment, namely that (1) only the Preservation clauses provide coverage, and (2) each Preservation clause separately and individually requires the use of presumed system-wide damages in the absence of actual property damages to calculate the Named Windstorm exception applicable to the coverages provided by each Preservation clause. As set forth above, the first facet is incorrect as the sue-and-labor clauses also provide coverage for FEC's expenses which were incurred to reduce the loss it experienced in the storm. The second facet also fails.

FEC is the master of its claim and has the prerogative to formulate its claim to maximize coverage. Here, FEC claimed coverage for its expenses under the sue-and-labor clauses, not the Preservation clauses. *See supra* Part II.B.

FEC does not dispute that the Preservation clauses provide *overlapping* coverage with the sue-and-labor clauses for FEC's claimed expenses. FEC

purchased an expensive all-risk Policy to gain as much coverage as possible, along with available coverage extensions. Some clauses will undoubtedly provide overlapping coverage in certain situations. Here, the Preservation clauses overlap with both each other and the sue-and-labor clauses. This does not mean that only the Preservation clauses provide coverage for FEC's expenses, as both the Section B and the Section C sue-and-labor clauses offer broader coverage for FEC's expenses and provide support for covering FEC's other losses.

When overlapping coverages exist, Florida law is clear that "the one affording greater coverage will prevail." *Burak*, 373 So. 2d at 90 n.2 (collecting cases); *Steuart*, 696 So. 2d at 379 (same). Thus, if two clauses provide coverage for the same loss, and one requires a higher deductible, Florida law permits FEC to claim under the clause with the lower deductible to maximize its coverage. *Id.* The language of the Policy limiting the Insurers liability under the Policy to only that portion of any loss that exceeds the applicable deductible supports this reading. (D61-2:13).

This rule means that even if the Preservation clauses mandate the application of a Named Windstorm exception of nearly $11 million, FEC may still make its claim for its expenses under other applicable Policy clauses that do not mandate such a high deductible. This should end the analysis. But assuming *arguendo* that FEC had made a claim for its expenses under the Preservation clauses, nothing

would change as neither Preservation clause requires application of more than a $750,000 deductible. The second facet of the district court's opinion is thus also without merit, and the district court erred both in concluding that only the Preservation clauses covered FEC's expenses and in concluding that each Preservations clause required the application of an enhanced deductible applicable to FEC's claim.

1. **The Section B Preservation clause does not trigger an enhanced deductible.**

The district court engaged in "mental gymnastics" to find that an enhanced deductible of nearly $11 million applied to FEC's claim "even without actual property damage" from any storm. (D91:11–13). The court based this conclusion on language in the Section B Preservation clause stating that covered expenses "shall be added to the direct physical loss or damage otherwise recoverable under this policy, and subject to the applicable deductible." (*Id.*) This conclusion is the cornerstone of the court's finding that FEC's claimed losses did not exceed the applicable deductible given the court's acknowledgment that FEC's expenses were covered by this clause. (*Id.*).

The term "property damages otherwise recoverable" in the Section B Preservation clause presupposes there is actual property damage to which the covered preservations expenses could be added. (D63-1:21). No language suggests that the insured should pretend that property damage occurred when seeking

coverage under this clause, and no language suggests the insured should expect the Insurers to use fictional property damage to calculate the amount of the applicable deductible to use on a claim under this clause.

But the district court still made this leap. The trial court effectively rewrote the Section B Preservation clause so that every crossing gate removed and protected came from a presumptively established "location damaged" regardless of what really occurred or even if a gate came from an area that Irma affected at all. In doing this, the court minimized coverage for FEC by maximizing the "applicable deductible" on this claim and on future claims when an insured successfully protects it property from storm damage. That conclusion is not a reasonable interpretation of "property damage otherwise recoverable." And it most certainly is not the only reasonable interpretation of that language.

The more reasonable reading of the Section B Preservation clause is that "if there is direct physical loss or damage, then" the covered costs will be added to that damage and subject to the "applicable deductible." "Applicable deductible" in this context only means that preservation expenses will be treated under the same deductible provision as the cause of the property damage "otherwise recoverable" (*i.e.*, General, Railroad Operations, Named Windstorm, Flood, Earthquake, Detection Equipment, or Fine Arts). However, if there is no direct physical damage as a result of successful preservation efforts as a hurricane approaches, then there

is no property damage to which the Preservation expenses should be added and either the $750,000 Railroad Operations deductible applies, or the minimum clause of the Named Windstorm exception is triggered since there are no "locations damaged" to calculate an enhanced deductible.

An example demonstrates why this is a more reasonable interpretation than the Insurers' approach. Assume that FEC was only able to remove half of their crossing gates before Irma struck and that the unremoved half were destroyed by the hurricane. In that scenario, the Section B Preservation clause would cover the expenses to remove the gates FEC was able to remove, and the Section B insuring clause would cover the property damage to the destroyed crossing gates. Under the Section B Preservation clause, the Section B Preservation expenses would be added to the property damage and subject to the applicable deductible, *i.e.*, the Named Windstorm exception in this hypothetical based on 5% of the property values at the actual locations damaged from the storm (not the locations damaged plus the locations from which the saved gates came).

The Insurers advanced a more extreme reading, suggesting that the "locations damaged" of the Named Windstorm exception is presumed to encompass the whole value of FEC's automatic gate crossings when all are removed, yielding a deductible based on system-wide values. (D61:20–21). The Insurers' position makes no sense and would only make sense if FEC could claim

46

as part of its loss the same fictional, system-wide property damage that the Insurers are using to calculate an enhanced deductible. Even so, the district court adopted the Insurer's reading. (D91:13). Such a departure from the actual Policy language is unnecessary and, contrary to Florida law, resolves ambiguities in the Policy against the insured.

The amount of FEC's loss under the Section B Preservation clause is the amount of its preservation expenses, and the "applicable deductible" in the absence of any real "locations damaged" is $750,000 regardless of whether it is derived from the Railroad Operations deductible or the minimum Named Windstorm exception. Nothing in the Section B Preservation clause supports using fictional damages to calculate an enhanced deductible on FEC's claim.

> 2. **The Section C Preservation Extension does not trigger an enhanced deductible.**

The Section C Preservation Extension likewise does not require the application of a nearly $11 million deductible through the Named Windstorm exception. The Section C Preservation Extension provides (1) overlapping coverage for the same expenses covered by the Section B and C sue-and-labor clauses and the Section B Preservation clause, and (2) overlapping coverage for a portion of FEC's lost revenues resulting from the removal of the gates. Where coverage is claimed under the extension, it states that such coverage "is subject to

the *deductible provisions* that would have applied had the physical loss or damage occurred." (D63-1:31) (emphasis added).

As a threshold matter, this extension of Section C Time Element coverage is the only clause that suggests the parties should select a deductible provision based on what "would have applied" if property damage had occurred. Given that this extension uses different language than the rest of the Policy, no other clause, including the Section B Preservation clause, should have been interpreted as calling for the exact same deductible. *Aleman v. Gervas*, 314 So. 3d 350, 352 (Fla. 3d DCA 2020) ("[A]s a general proposition, the use of different language in different contractual provisions strongly implies that a different meaning was intended." (citation omitted)). Each clause and each word of the Policy should be interpreted to give it full effect and meaning. *French*, 897 So. 2d at 488. This was not done here.

The Section C Preservation Extension also does not direct the parties to apply the deductible amount that would have applied if there were "locations damaged," nor does it instruct the parties to use system-wide property values "as if every property protected came from a location damaged." Yet, this is what the Insurers argued and the district court adopted.

If that were their intent, the Insurers could have specified this intent clearly when drafting this extension of coverage. They did not, and so it is reasonable to

read the Section C Preservation Extension as not directing the parties to pretend the entire system should be "locations damaged" for purposes of the Named Windstorm exception. Instead, a reasonable interpretation of this clause is that the Section C Preservation Extension expected some "physical loss or damage occurred" from the peril at issue (such as a Named Windstorm, Flood, or Earthquake) when determining which deductible provision to apply, but not that "locations damaged" included every location at which preservation efforts occurred when calculating the deductible *amount* to apply. There is a big difference between choosing a deductible provision from the listed seven possibilities and setting the amount of the deductible under the Named Windstorm exception. The extension itself provides direct guidance on which "deductible provisions" to choose but makes no mention of how to calculate any deductible amount. Had there been property damage from Hurricane Irma to the removed crossing gates where they were stored, then the "locations damaged" analysis would properly be restricted to that storage location, not the entire system.

More fundamentally, there is an inherent tension in the Insurers and the district court's position that the Named Windstorm exception applies using system-wide values without there being any actual "locations damaged from and as respects Named Windstorm." A reasonable reading of the Named Windstorm exception is that actually having "locations damaged from" a Named Windstorm is

49

a precondition to calculating the "5% of property values" deductible regardless of the insuring clause under which an insured makes a claim. Indeed, it is impossible to accurately calculate the deductible (other than applying the $750,000 minimum) without knowing what "locations" were "damaged." It is also unfair to FEC to creatively read a few policy clauses to calculate an enhanced deductible based on system-wide property values without any locations suffering damage.

3. **Without an enhanced deductible, the two Preservation clauses provide redundant coverage for FEC's expenses and at least $1,291,823 of FEC's lost business.**

If the Court agrees that the two Preservation clauses do not require a deductible over $750,0000, FEC alternatively argues that the Preservation clauses provide redundant coverage for its $2,148,690 in expenses and at least $1,291,823 in lost revenue from September 7, 2017, to September 9, 2017, as determined by the district court. (*See* D91:14). The parties agree that these clauses cover this portion of FEC's loss and disagree as to whether these are the only clauses that provide such coverage and as to the amount of the applicable deductible. As the Court must read the Policy to maximize FEC's coverage, *James*, 540 F.3d at 1274, FEC recovers under all clauses without an enhanced deductible.

F. **The Insurers' interpretation leads to absurd results.**

Plain language and common sense demonstrate that the Insurers' interpretation of the Policy is unreasonable. An interpretation that places the

insured in a better position if it allows some of its property to be destroyed in a hurricane rather than taking measures to protect all of its property is absurd.

Under the Insurers' convoluted interpretation, FEC would have been better off taking no protective actions and allowing many of its crossing gates to be destroyed by Irma to maximize its payout under the Policy and minimize its deductible, thereby reducing its ultimate net loss. FEC is not a single-location home or business owner. It owns and operates over 300-miles of contiguous railroad tracks running the length of the "Florida East Coast." Since FEC cannot precisely know which locations throughout its system will be damaged in the days before a major hurricane makes landfall, the logical course of action to protect its insured property is to remove all gates within the projected path of the storm, which may include, as with Irma, over 600 gates throughout the bulk of its 300-mile system.

If doing so, however, will trigger a nearly $11 million deductible based on a presumption of damages throughout the entire system, regardless of the actual damages that did or would have occurred, then the more economical course of action would be for FEC to remove *no* gates anywhere in the system and allow the storm to destroy whatever locations it strikes. In such a situation, FEC's deductible would be reduced to 5% of the value of the locations actually damaged instead of 5% of the value of the entire system. No matter what percentage of the system was

actually damaged, the resulting deductible would be less than what the district court did in the instant claim—just presume 100% of locations were damaged. Of course, while this approach would likely render the sue-and-labor clauses irrelevant as the Insurers would have no savings, this approach would provide FEC with a smaller deductible and covered claims for property damage, business interruption, and extra expenses. An interpretation leading to such an absurd result cannot be the only reasonable way to read the Policy.

For example, here the district court calculated FEC's deductible at approximately $11 million based on a presumption of damage to 100% of FEC's crossing gate locations. If FEC took no protective actions and 10% of its crossing gates were actually damaged by Irma, resulting in $10 million in losses, then FEC would only have a $1.1 million deductible (one-tenth of $11 million) and the Insurers would be liable for $8.9 million on the claim. This would be a far better result for FEC than incurring $5 million in loss to protect only the Insurers.

The economic reality is this: the Insurers relied on FEC to act in good faith to save them money by preventing destruction from Irma, and when FEC did this, the Insurers argued that they owed FEC nothing under a stretched and novel reading of the Policy based on a fiction of "presumed locations damaged." This strained interpretation creates perverse incentives inconsistent with the parties' bargain and leads to absurd results such as prioritizing property damage over

property preservation, or waiting until a storm strikes before incurring any expenses to reduce future losses. The Court should reject the Insurers' absurd reading of the Policy, especially when reasonable alternative interpretations are available. *Vyfvinkel v. Vyfvinkel*, 135 So. 3d 384, 386 (Fla. 5th DCA 2014) ("[W]here one interpretation of a contract would be absurd and another would be consistent with reason and probability, the contract should be interpreted in the rational manner.").

The Insurers' self-serving reasoning here demonstrates why Florida law requires courts to resolve all ambiguities in favor of insureds—to protect insureds from creative attempts by their insurers to limit coverage *post hoc,* especially on a deductible clause so unclear that the Insurers had to "poll" themselves on how to interpret their own language. Clear, unambiguous policy clauses do not need to be subject to a "poll" among participating insurers. As the Policy can be reasonably read without creating perverse incentives and absurd results, the Court should find that the Policy does not require the application of more than a $750,000 deductible under the facts of FEC's claim.

## III. ALTERNATIVELY, GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT TO THE INSURERS.

Even if the Named Windstorm exception applies to FEC's claim in the absence of any locations damaged, the district court still erred in granting summary judgment to the Insurers. To rule for the Insurers, the district court first had to

determine the appropriate value of the property at issue against which to assess the 5% formula. On the record before it, the district court was in no position to determine the "5% property value at locations damaged." Thus, even if it did not adopt FEC's proposed reading of the Policy, the court should have found that factual issues remained and denied summary judgment to the Insurers. *See* Fed. R. Civ. P. 56(a) (summary judgment only appropriate when "the movant shows that there is no genuine dispute as to any material fact").

As FEC explained below, the district court could not have determined "property values at locations damaged" values on the evidence before it. The parties agreed that no locations were "damaged" by Irma. The value of the "locations damaged," even if the Policy were to be applied as if some property damaged "had occurred," would depend on of the location of the gates that would have been "damaged," and the age, condition and values of the equipment at such locations. There is no record evidence of any of that. Indeed, the district court all but conceded that it did not have a sufficient factual predicate to assess these values when it said that "[t]he parties have not provided the total property values for all 600 affected locations." (D91:13). On this record, summary judgment was due to be denied. Instead, the district court factually assumed that the correct figure was "the value of the automatic crossing systems, totaling $219,019,894." (*Id.*)

This assumption was not only unsupported by record evidence, it was also hotly contested in the proceedings below. The Insurers contended initially that the proper variable for calculating the enhanced deductible was 5% of FEC's reported annual business interruption value, (D72:14–16;D64-2:446–447), before later asserting that it was "the value of th[e] automatic crossing gates" that FEC estimated to be approximately $219 million. (D61:20–21). FEC rightly countered that business interruption values are not "property value[s]" within the meaning of the Named Windstorm deductible. (D72:14–15). Additionally, FEC rightly argued that an assessment of "5% of property values at locations damaged" would require the Insurers to prove "the railroad's resulting property damage occurred at a tangible and identifiable 'location[] damaged' by a Named Windstorm," which they had not done. (D72:13). At the trial court, there was no agreement on the correct property value assessment for any "presumed damaged" property (though they did *agree* that no damage occurred).

The district court did not require the Insurers to provide evidence to substantiate their valuation of the Named Windstorm exception. The district court also did not assess the actual value of the property that would have been damaged but for FEC's preservation efforts. Instead, the district court factually assumed a system-wide property value applied without any Policy language requiring that assumption. Tellingly, the court conceded that "[t]he parties have not provided the

total property values for all 600 affected locations," then found that the "minimum" value totaled approximately $219 million. (D91:13).

A party must establish key factual predicates to succeed on summary judgment. This would have required the Insurers to (1) specifically identify the affected property, and (2) assess the economic value of such property. This would have been no easy task for the specialized accounting firms retained by the parties in this case. But neither the Insurers nor the district court attempted it.

The issue of these values is obviously factually intensive, and logically requires a trial to resolve disputed factual issues. That did not occur. Instead, the court found that "at a minimum, [the 600 crossing gate] locations include the value of the automatic crossing systems, totaling $219,019,894." (D91:13). The district court noted that the "figure was provided by FEC and is undisputed by the insurers." (*Id.*) But it was not submitted as a value for affected property.

The speculation required by the district court's interpretation further confirms that FEC's interpretation of the deductible clause is correct. The deductible is $750,000, not 5% of unknown property values at unknown locations presumed to be (but not actually) damaged. Accordingly, even if this Court is inclined to agree that the Named Windstorm exception applies and could be more than the $750,000 minimum even without any locations damaged, the case should

be remanded for further proceedings to definitively resolve disputed factual issues and determine the "5% of property values at locations damaged."

## CONCLUSION

For the foregoing reasons, FEC respectfully requests that the Court reverse the district court's summary judgment and remand for entry of summary judgment in favor of FEC. FEC alternatively requests that the Court reverse and remand for trial on whether FEC's claims exceed the Named Windstorm exception.

Respectfully submitted,

/s/ *Thomas E. Bishop*
Thomas E. Bishop
Florida Bar Number 956236
Frederick D. Page
Florida Bar Number 968587
Kyle William Mason
Florida Bar Number 1045149
BISHOP PAGE & MILLS, PLLC
510 N. Julia Street
Jacksonville, FL 32202
Tel. (904) 598-0034
Fax. (904) 598-0395
tbishop@bishoppagemills.com
fpage@bishoppagemills.com
kmason@bishoppagemills.com
service@bishoppagemills.com

Jonathan Y. Ellis
MCGUIREWOODS LLP
501 Fayetteville St., Ste. 500
Raleigh, NC 27601
Tel: (919) 755-6688
jellis@mcguirewoods.com

Thomas R. Brice
MCGUIREWOODS LLP
50 N. Laura St., Ste. 3300
Jacksonville, FL 32202
Tel: (904) 360-6335
tbrice@mcguirewoods.com

Francis J. Aul
MCGUIREWOODS LLP
888 16th Street NW, Ste. 500
Washington, DC 20006
Tel: (202) 857-1713
faul@mcguirewoods.com

*Attorneys for Plaintiff-Appellant Florida East Coast Holdings Corporation*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation of Rule 32(a)(7), Federal Rules of Appellate Procedure, in that it contains 12,866 words (including words in footnotes) according to Microsoft Word 2010, the word-processing system used to prepare this brief.

/s/ *Thomas E. Bishop*
Attorney

## CERTIFICATE OF SERVICE

I hereby certify that on July 17, 2024, I sent four paper copies of the foregoing by U.S. mail to the Clerk of this Court pursuant to 11th Cir. R. 31-3. I also

electronically filed this brief on July 17, 2024, using the Court's Appellate PACER

system, which will automatically send notification to counsel of record.


/s/ *Thomas E. Bishop*
Attorney