IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆◆◆

FLORIDA EAST COAST HOLDINGS CORPORATION,

*Plaintiff-Appellant,*

—v.—

LEXINGTON INSURANCE COMPANY, D.B.A. AMERICAN INTERNATIONAL
GROUP INC., ASPEN SPECIALTY, HOUSTON CASUALTY,
ALLIED WORLD, IRONSHORE SPECIALTY, ET AL.,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

# BRIEF FOR DEFENDANTS-APPELLEES

WAYNE GLAUBINGER
ERIC T. KREJCI
MOUND COTTON WOLLAN
 & GREENGRASS, LLP
1 New York Plaza, 44th Floor
New York, New York 10004
(212) 804-4200

PERRY GOODMAN
MOUND COTTON WOLLAN
 & GREENGRASS, LLP
110 East Broward Boulevard,
 Suite 610
Fort Lauderdale, Florida 33301
(954) 467-5800

*Counsel for Defendants-Appellees*

PAUL L. FIELDS, JR.
STEPHEN A. KAHN
FIELDS HOWELL, LLP
665 8th Street NW
Atlanta, Georgia 30318
(404) 214-1250

*Counsel for Defendant-Appellee
 Ironshore Specialty Insurance
 Company*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In compliance with 11th Cir. R. 26.1-1, the undersigned certifies that the following is a complete list of all trial judge(s), attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, and includes subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

1.    1102952 B.C. Unlimited Liability Company

2.    AIG Property Casualty Inc.

3.    AIG Property Casualty U.S., Inc.

4.    Allied World Assurance Company Holdings, Ltd.

5.    Allied World Assurance Company Holdings I, Ltd.

6.    Allied World Assurance Company, Ltd.

7.    Allied World Assurance Company (U.S.) Inc.

8.    Allied World Assurance Holdings (Ireland) Ltd

9.    Allied World Assurance Holdings (U.S.) Inc.

10.   Allied World Insurance Company

11.   American International Group, Inc. (NYSE:AIG)

12.   Aspen American Insurance Company

13.   Aspen Insurance Holdings Limited (NYSE: AHL-E)

14. Aspen Specialty Insurance Company

15. Aspen U.S. Holdings, Inc.

16. Aspen (UK) Holdings, Limited

17. Aul, Francis

18. Axa A.A. (OTCMKTS: AXAHY)

19. Barksdale, Patricia D. – U.S. Magistrate Judge

20. Bishop Page & Mills, PLLC

21. Bishop, Thomas E.

22. Brice, Thomas R.

23. Corrigan, Timothy J. – U.S. District Judge

24. Ellis, Jonathan Yates

25. EXEL Holdings Limited

26. Fairfax Financial Holdings Limited (OTCMKTS:FRFHF)

27. Fields Howell, L.L.P.

28. Fields, Jr., Paul L.

29. Florida East Coast Holdings Corporation

30. Fulton, Wendy Stein

31. Glaubinger, Wayne R.

32. Goodman, Perry R.

33. Grupo Mexico Transportes, S.A.B de C.V.

34. HCC Insurance Holdings, Inc.

35. Houston Casualty Company

36. Indian Harbor Insurance Company

37. Ironshore Holdings (U.S.) Inc.

38. Ironshore Specialty Insurance Company

39. Kahn, Stephen A.

40. Krejci, Eric T.

41. Kynes, Cameron G.

42. Lexington Insurance Company

43. Liberty Mutual Group, Inc.

44. Liberty Mutual Insurance Company

45. Liberty Mutual Holding Company Inc.

46. LMHC Massachusetts Holdings Inc.

47. Mason, Kyle William

48. McGuireWoods LLP

49. Mound Cotton Wollan & Greengrass LLP

50. OCM Goldfish Inc.

51. Oostdyk, Scott C.

52. Sheldon, Scott J.

53. Tokio Marine Holdings, Inc. (OTCMKTS: TKOMY)

54. Tokio Marine & Nichido Fire Insurance Co. Ltd.

55. Turetzky, Brook D. Oransky

56. Walsh, Sean Patrick

57. Watsa, Prem

58. X.L. America, Inc.

59. XL Bermuda Ltd

60. XL Financial Holdings (Ireland) Limited

61. XL Group Ltd

62. XLIT Ltd.

63. XL Reinsurance America Inc.

64. XL Specialty Insurance Company

## **APPELLEES' CORPORATION DISCLOSURES**

1. Defendant/Appellee Lexington Insurance Company is a direct, wholly-owned (100%) subsidiary of AIG Property Casualty U.S., Inc., which is a wholly-owned (100%) subsidiary of AIG Property Casualty Inc., which is a wholly-owned (100%) subsidiary of American International Group, Inc., which is a publicly-held corporation. No parent entity or publicly held entity owns 10% or more of the stock of American International Group, Inc.

2. Defendant/Appellee Aspen Specialty Insurance Company is a wholly own subsidiary of Aspen American Insurance Company. Aspen American Insurance

Company is a wholly owned subsidiary of Aspen U.S. Holdings, Inc. Aspen U.S. Holdings, Inc. is a wholly owned subsidiary of Aspen (UK) Holdings, Limited. Aspen (UK) Holdings, Limited is a wholly owned subsidiary of Aspen Insurance Holdings Limited. Certain preference shares and depositary shares of Aspen Insurance Holdings Limited are listed on the New York Stock Exchange.

3. Defendant/Appellee Allied World Assurance Company (U.S.) Inc. is a wholly-owned subsidiary of Allied World Insurance Company, which is wholly owned by Allied World Assurance Holdings (U.S.) Inc. Allied World Assurance Holdings (U.S.) Inc. is wholly owned by Allied World Assurance Holdings (Ireland) Ltd., which is wholly owned by Allied World Assurance Company, Ltd. Allied World Assurance Company, Ltd. is wholly owned by Allied World Assurance Company Holdings I, Ltd., which is wholly owned by Allied World Assurance Company Holdings, Ltd. 1102952 B.C. Unlimited Liability Company, a Canadian company, owns 70.89% of Allied World Assurance Company Holdings, Ltd.; OCM Goldfish Inc., a Canadian company, owns 18.42% of Allied World Assurance Company Holdings, Ltd.; the remaining shares of Allied World Assurance Company Holdings are held by minority investors, none of which owns 10% or more of its stock. 1102952 B.C. Unlimited Liability Company is wholly owned by Fairfax Financial Holdings Limited, a Canadian corporation. Fairfax Financial Holdings Limited is a publicly traded company, with 43.61% of its

shares beneficially owned and controlled by Mr. Prem Watsa and no publicly held company owning more than 10% of its stock.

4. Defendant/Appellee Houston Casualty Company is a wholly owned subsidiary of HCC Insurance Holdings, Inc., a Delaware corporation. HCC Insurance Holdings, Inc is a wholly owned subsidiary of Tokio Marine & Nichido Fire Insurance Co. Ltd., a Japanese corporation. Tokio Marine & Nichido Fire Insurance Co. Ltd. is a wholly owned subsidiary of Tokio Marine Holdings, Inc., a Japanese corporation. Tokio Marine Holdings, Inc. is a publicly traded company, traded through the OTC Markets platform (OTCMKTS: TKOMY). No parent corporation or publicly held corporation owns 10% or more of the stock of Tokio Marine Holdings, Inc.

5. Defendant/Appellee Indian Harbor Insurance Company is a direct subsidiary of XL Specialty Insurance Company, and is an indirect subsidiary XL Reinsurance America Inc., X.L. America, Inc., XL Financial Holdings (Ireland) Limited, XL Bermuda Ltd, EXEL Holdings Limited, XLIT Ltd., XL Group Ltd., and AXA SA. The ultimate indirect parent of IHIC is AXA SA, a company domiciled in France.

6. Defendant/Appellee Ironshore Specialty Insurance Company is a wholly owned subsidiary of Ironshore Holdings (U.S.) Inc. Liberty Mutual Insurance Company owns 100% of the stock of Ironshore Holdings (U.S.) Inc. Liberty Mutual Group, Inc. owns 100% of the stock of Liberty Mutual Insurance

Company. LMHC Massachusetts Holdings Inc. owns 100% of the stock of Liberty Mutual Group Inc. Liberty Mutual Holding Company Inc. owns 100% of the stock of LMHC Massachusetts Holdings Inc.

Respectfully submitted,

MOUND COTTON WOLLAN & GREENGRASS, LLP

*/s/ Eric T. Krejci*

Wayne R. Glaubinger
WGlaubinger@moundcotton.com
Eric T. Krejci, Esq.
EKrejci@moundcotton.com
Perry Goodman
PGoodman@moundcotton.com

*Counsel for Defendants/Appellees*

FIELDS HOWELL, LLP

*/s/ Paul L. Fields, Jr.*

Paul L. Fields, Jr.
pfields@fieldshowell.com
Stephen A. Kahn
skahn@fieldshowell.com

*Counsel for Defendant/Appellee Ironshore Specialty Insurance Company*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................ C-1

TABLE OF AUTHORITIES .................................................................... iii

STATEMENT OF THE ISSUES ................................................................ 1

STATEMENT OF THE CASE .................................................................... 2

I.  Insurers Issue a Commercial Property Insurance Policy to Florida East Coast Holdings Corporation ............................................. 2

    A.  The Declarations – Section A Sets Forth the Named Windstorm Deductible ...................................................................... 2

    B.  Property Damage – Section B Contains Various Coverages and "Additional Coverages" ................................................................ 3

    C.  Time Element– Section C Contains Various Coverages and "Time Element Coverage Extensions" .............................................. 5

II.  FEC Submitted an "Estimated Property Value Summary" to the Insurers ................................................................................................. 6

III. Before Hurricane Irma Makes Landfall, FEC Follows Its Internal Pre-Hurricane Policy by Removing Crossing Gates at over 600 Locations ............................................................................................... 7

IV. FEC Submits an Insurance Claim and, Over the Next Three Years, Tries to Alter the Claim to Avoid the 5% Named Windstorm Deductible ......................................................................... 8

SUMMARY OF THE ARGUMENT ......................................................... 10

ARGUMENT ........................................................................................... 12

I.  FEC'S Claim Falls Solely Within the Protection and Preservation of Property Provisions of Sections B and C of the Policy ........................................................................................ 12

A. Coverage Is Not Available for FEC's Claim Under the Business Interruption Provision of the Policy .................................12

B. The "Protection and Preservation of Property" Clauses in Sections B and C of the Policy Apply to FEC's Entire Claim ........15

C. The "Expenses to Reduce Loss" Provisions Apply Only *After* an Insured Sustains Covered Physical Loss or Damage to Property and Thus, are Inapplicable to FEC's Claim.....................17

D. Principles of Contract Construction Require a Finding That the "Protection and Preservation of Property" Provisions and the "Expenses to Reduce Loss" Provisions Do Not Provide Overlapping or Superfluous Coverage ...........................................20

E. The "Expenses to Reduce Loss" Provisions in Sections B and C of the Policy are not "Sue and Labor" Clauses ..........................25

F. FEC Improperly Contends That the Insurers' Interpretation of the Policy Provisions Would "Incentivize the Insured to Stand Idly by Rather Than Take Proactive Measures to Protect Property.".........................................................................27

II. The District Court Properly Concluded That the 5% Named Windstorm Deductible Applies to FEC's Hurricane Irma Claim and Must Be Calculated Using the Figures Submitted by FEC for All Claimed Locations ......................................................................28

CONCLUSION .......................................................................................33

CERTIFICATE OF COMPLIANCE .........................................................34

CERTIFICATE OF SERVICE ..................................................................35

# TABLE OF AUTHORITIES

## Cases

*Always Smiling Productions, LLC v. Chubb Nat. Ins. Co.*,
  No. CV-21-5990, 2022 WL 4102315 (C.D. Cal. Sept. 6, 2022),
  *aff'd* 2023 WL 11849867 (9th Cir. July 11, 2024) ........................ 18, 19

*Am. Male & Co. v. Owners Ins. Co.*,
  No. 21 CV 02595, 2023 WL 2646771 (N.D. Ill. Mar. 27, 2023) .......... 13

*Atma Beauty, Inc. v. HDI Glob. Specialty SE*,
  559 F. Supp. 3d 1311 (S.D. Fla. 2021) ............................................... 14

*Auto-Owners Ins. Co. v. Anderson*,
  756 So. 2d 29 (Fla. 2000) ................................................................... 21

*Bourgier v. Hartford Cas. Ins. Co.*,
  No. 21-21053-CIV-MORENO, 2021 WL 3603601
  (S.D. Fla. Aug. 12, 2021) ................................................................... 14

*Commodore, Inc. v. Certain Underwriters at Lloyd's London*,
  342 So. 3d 697 (Fla. 3d DCA 2022) ................................. 12, 14, 21, 23

*Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*,
  20 F.4th 303 (7th Cir. 2021) ......................................................... 23, 24

*Hepp v. Paul Revere Life Ins. Co.*,
  120 F. Supp. 3d 1328 (M.D. Fla. 2015) .............................................. 20

*Mama Jo's Inc. v. Sparta Ins. Co.*,
  823 F. App'x 868 (11th Cir. 2020) ..................................................... 12

*MJCM, Inc. v. Hartford Cas. Ins. Co.*,
  No. 8:90-CV-2275, 2010 WL 1949585 (M.D. Fla. May 14, 2010) ....... 20

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa v. Texpak Grp. N.V.*,
  906 So. 2d 300 (Fla. Dist. Ct. App. 2005)........................................... 18

*Pan Am Equities, Inc. v. Lexington Ins. Co.*,
  No. H-18-2937, 2019 WL 2115173 (S.D. Tex. May 2, 2019)............... 29

*In re Pan Am. World Airways, Inc., Maternity Leave Pracs. & Flight
  Attendant Weight Program Litig.*,
  905 F.2d 1457 (11th Cir. 1990) .......................................................... 20

*Reliance Ins. Co. v. The Escapade*,
　280 F.2d 482 (5th Cir. 1960) .............................................................. 26

*SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*,
　32 F.4th 1347 (11th Cir. 2022) ........................................................... 12

*Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*,
　845 So. 2d 161 (Fla. 2003) ................................................................. 26

**Regulations**

49 C.F.R. pt. 234, App'x B (Oct. 1, 2016 ed.) ............................................ 7

## **STATEMENT OF THE ISSUES**

1. Whether the entire claim is covered exclusively by the two "Protection and Preservation of Property" provisions.

2. Whether the Named Windstorm deductible of "5% of property values at locations damaged from and as respects Named Windstorm" applies when the insured took action prior to a hurricane to protect and preserve insured property.

3. Whether, in calculating the Named Windstorm deductible, the values of all locations where the insured protected and preserved covered property prior to a hurricane should be considered.

# STATEMENT OF THE CASE

## I. Insurers Issue a Commercial Property Insurance Policy to Florida East Coast Holdings Corporation.

The appellees, Lexington Insurance Company (incorrectly served as "Lexington Insurance Company d/b/a American International Group, Inc.), Aspen Specialty Insurance Company (incorrectly served as "Aspen Specialty"), Houston Casualty Company (incorrectly served as "Houston Casualty"), Allied World Assurance Company (U.S.) Inc. (incorrectly served as "Allied World"), Indian Harbor Insurance Company (incorrectly served as "Indian Harbor (XL)"), and Ironshore Specialty Insurance Company (incorrectly served as "Ironshore Specialty") (collectively, the "Insurers") severally issued separate commercial property policies to FEC for the period from March 1, 2017 to March 1, 2018 (collectively, the "Policy"). (D61-2, D61-3, D61-4, D61-5, D61-6, D61-7.)[1] The Policy contains three relevant sections: Declarations – Section A; Property Damage – Section B; and Time Element – Section C. (D61-2:8,13,26.)

### A. The Declarations – Section A Sets Forth the Named Windstorm Deductible.

The Policy's deductible provision, which is set forth in the Declarations – Section A, states:

---

[1] The policies issued by each Defendant are identical in every respect for the purposes of this action. Therefore, for ease of reference all citations to "D61-2" shall mean D61-2, D61-3, D61-4, D61-5, D61-6, D61-7.

In each case of loss covered by this Policy, the Insurers will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible specified below, and only for its share of that greater amount.

Unless otherwise stated below:

A. When this Policy insures more than one property, the deductible will apply against the total loss covered by this Policy in any one occurrence.

B. If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided.

In each case of loss covered

<u>Policy Deductible(s)</u>

$ 100,000 combined all coverages except:
$ 750,000 as respects **Railroad Operations** except;
5% of property values at locations damaged from and as respects **Named Windstorm** including or any combination of Flood resulting from Named Windstorm subject to a minimum deductible of $750,000;
$250,000 as respects Flood except $750,000 for Flood within Zones A and V;
$100,000 as respects Earthquake;
$100,000 as respects rail flaw detection equipment;
$25,000 as respects Fine Arts;

(D61-2:13.)

## B. Property Damage – Section B Contains Various Coverages and "Additional Coverages".

The Insuring Clause of Property Damage – Section B provides that the

Policy "insures against all risks of direct physical loss or damage to the insured

property occurring during the policy period from any cause except herein excluded." (D61-2:13.)

Section B also contains various "Additional Coverages." Among these Additional Coverages are provisions relating to "Expenses to Reduce Loss" and "Protection and Preservation of Property." (*Id.* at 20-21.) The Expenses to Reduce Loss provision states:

**Expenses to Reduce Loss**

Policy covers such expenses as are necessarily incurred for the purpose of reducing any loss under this policy, however, such expenses shall not exceed the amount by which the loss as covered by this policy is thereby reduced. It is expressly understood and agreed that any expense incurred by the Insured as a consequence of a loss covered hereunder to clear the lines, recover, save or preserve property insured shall be covered hereunder.

(*Id.* at 20.)

The Protection and Preservation of Property provision states:

**Protection and Preservation of Property**

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property.

\*     \*     \*

Insured Property covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under this

policy, and subject to the applicable deductible, sublimit of liability and policy limit.

(*Id.* at 21.) Notably, both the Additional Coverages for Expenses to Reduce Loss and Protection and Preservation of Property "are subject to the Policy provisions, including applicable exclusions and deductibles, all as shown in this section and elsewhere in this Policy." (*Id.* at 15.)

      **C.**    **Time Element– Section C Contains Various Coverages and "Time Element Coverage Extensions".**

Time Element – Section C contains a "Loss Insured" provision, which provides, in pertinent part:

**LOSS INSURED**

A.    This Policy insures Time Element loss, as provided in the Time Element Coverages[2], directly resulting from physical loss or damage of the type insured by this Policy….

            \*      \*      \*

C.    This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

(D61-2:26.)

---

[2] The Time Element Coverages include "Business Interruption/Loss of Income," "Extra Expense," "Leasehold Interest," "Rental Insurance," "Locomotive Rental Expense," and "Royalties, Licensing Fees, Technical Fees, Commissions, and Dividends." (D61-2:26-29.)

Also included within Time Element – Section C is the following "Time Element Coverage Extension" for "Protection And Preservation Of Property – Time Element":

**Protection And Preservation Of Property – Time Element**

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this Policy at such insured property.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

(*Id.* at 31.)

## II. FEC Submitted an "Estimated Property Value Summary" to the Insurers.

In connection with the purchase of the Policy, FEC submitted an "Estimated Property Value Summary" to the Insurers. (D61-13:1.) The Estimated Property Value Summary identified the Total Insured Values as $824,440,808, which was broken down by Property Values Total of $725,654,663 and Business Interruption Values of $98,786,145. (*Id.* at 3.) The Property Values were broken down into fourteen categories, one of which was "Automatic Crossings" with a value of $219,019,894. (*Id.*)

Attached to the Estimated Property Value Summary page is a spreadsheet that contains, among other things, listings for Automatic Crossings at 623 different

locations, each valued between $233,506 to $529,186. (*Id.* at 10-39.) Notably, as addressed below, the insurance claim at issue involves Automatic Crossings at all 623 locations. (D1-5.)

### III. Before Hurricane Irma Makes Landfall, FEC Follows Its Internal Pre-Hurricane Policy by Removing Crossing Gates at over 600 Locations.

On August 30, 2017, Hurricane Irma first formed as a storm in the Atlantic Ocean. (D1:4.) Hurricane Irma eventually grew into a Category 5 hurricane as it made its way toward the Florida coast. (*Id.*) Ultimately, Hurricane Irma made landfall in Florida on September 10, 2017. (*Id.* at 12.)

FEC has a company policy that governs its preparations for hurricanes (the "Pre-Hurricane Policy"). (D61-8.) FEC's Pre-Hurricane Policy directs that when a hurricane is predicted to be a Category 2 or greater at landfall, crossing gates longer than 26 feet are to be taken down and shorter gates are to be secured. (*Id.* at 32.) When crossings are not gated, trains can only run at full speed when police or flaggers man the crossings; otherwise, trains must run at reduced speeds of approximately 10 mph rather than 60 mph. (D61-31:3; *see also* 49 C.F.R. pt. 234, App'x B (Oct. 1, 2016 ed.) (specifying permitted speeds if gates are not operational)).

On September 7, 2017, in advance of Hurricane Irma's arrival, FEC began to implement its Pre-Hurricane Policy by dispatching crews "to begin unbolting,

removing, and storing roughly 600 crossing gates." (D1:5.) These actions, according to FEC, "avoid[ed] significant property damage to the restraints." (*Id.*)

### IV. FEC Submits an Insurance Claim and, Over the Next Three Years, Tries to Alter the Claim to Avoid the 5% Named Windstorm Deductible.

On September 14, 2017, FEC's Director of Risk Management, Mark Richmond, instructed FEC's insurance brokers at Lockton to provide notice of an insurance claim to the Insurers, which Lockton did that same day. (D61-9; D1:7.) By November 2017, FEC advised the Insurers' designated insurance adjuster, Bob Steller, that it would likely submit a claim for approximately $1.6 million in damage to a bridge, approximately $3.1 million in damage and expenses related to tracks and signals, and approximately $3 to $4 million in business interruption losses. (D61-11:1.)

The insurance claim emanated from Hurricane Irma, so the Insurers (through Steller) sent Richmond a letter on December 7, 2017 advising that the Named Windstorm deductible's 5% calculation would apply to the entirety of FEC's insurance claim. (D61-14:3.) The letter also advised that, based on the rough estimates of loss FEC had provided in November 2017, the total loss would fall below the applicable deductible. (*Id.*)

FEC considered the potential impact of the Named Windstorm deductible on the claim to be filed under the Policy. Richmond reached out to FEC's insurance

broker, Lockton, to see if someone "could help" on the deductible issue. (D61-12:3.) On December 7, 2017, Angela Wright, a Senior Account Manager at Lockton, advised that she had "not found a clear-cut way to help [Richmond's] argument" and that the Named Windstorm deductible would likely apply. (*Id.* at 1.) Wright noted, though: "Hopefully, we can find what I am missing or come up with a creative solution." (*Id.*)

Six months later, on June 22, 2018, Lockton sent FEC's "claim for damages as a result of Hurricane Irma." (D61-16:1.) Lockton specified that FEC was "not claiming any physical damage, but rather Time Element [losses]. Therefore, per the deductible policy language, the $750,000 minimum Named Windstorm deductible should apply." (*Id.*) It was not until February 20, 2020, that FEC sent a business interruption claim totaling $3,388,424 for the period from September 7, 2017 through September 18, 2017. (D61-19:2.) This submission, though, failed to document any physical damage that caused the necessary interruption or suspension of FEC's operations. (*Id.*)

On December 2, 2020, Steller sent a letter on behalf of Insurers noting that, inasmuch as FEC continued to maintain the position that it was submitting only a business interruption claim, the Named Windstorm deductible, calculated at $4.9 million, would apply. (D61-27.) On February 2, 2021, FEC's counsel first asserted that its claim was solely made up of "pre-storm gate removal and post-storm re-

installation and business interruption expenses." (D61-28:3.) In that letter, FEC contended for the first time that its loss was recoverable under the Policy's Section B "Expenses to Reduce Loss" clause and that its claim could not be "offset by any type of deductible or retention." (*Id.* at 5.)

FEC commenced this action against the Insurers on August 11, 2021. (D1). The parties cross-moved for summary judgment. (D61, D62, D71, D72, D76, D80). By Order dated February 7, 2024, the District Court granted the Insurers' summary judgment motion and denied FEC's. (D91). FEC moved for reconsideration on March 7, 2024. (D93). The District Court denied that motion on April 9, 2024. (D96). Thereafter, FEC filed this appeal. (D97).

## SUMMARY OF THE ARGUMENT

The District Court properly determined that, inasmuch as FEC acknowledged that its claim did not involve any property damage, the only applicable coverages under which FEC could make its claim are the Protection and Preservation of Property coverages under both Sections B and C of the Policy. The Protection and Preservation of Property provisions provide coverage for expenses incurred by the insured and income lost as a result of an insured's efforts to protect its property prior to any direct physical loss or damage to that property.

In addition, the District Court properly concluded that the applicable deductible for the Protection and Preservation of Property coverages is the Named

Windstorm deductible, which requires a deductible of 5% of property values at the locations where the insured took steps to protect and preserve its Automatic Crossings. Further, the District Court properly concluded that recovery under Section C Protection and Preservation of Property, was limited to lost revenue only from September 7 to September 9, 2017, because that provision limits recovery to forty-eight hours before to forty-eight hours after FEC first began taking steps to protect or preserve the crossing gates.

FEC's position hinges on the mistaken argument that it is entitled to coverage under the Expenses to Reduce Loss provisions, which it incorrectly characterizes as "sue-and-labor" clauses. The Expenses to Reduce Loss provisions, found in both Sections B and C of the Policy, apply only to expenses to reduce a covered property loss that already has occurred. Where, as here, the claim does not involve physical loss or damage to covered property, the Expenses to Reduce Loss provisions are inapplicable.

Finally, the District Court correctly calculated the 5% Named Windstorm deductible using the Automatic Crossing values FEC provided to the Insurers (i.e., $219,019,894) for a total deductible of $10,950,994.70. (D91:13.) FEC's claim in the amount of $5,605,881 falls well below that deductible. (*Id*. at 14.)

# ARGUMENT

## I. FEC'S Claim Falls Solely Within the Protection and Preservation of Property Provisions in Sections B and C of the Policy.

### A. Coverage Is Not Available for FEC's Claim Under the Business Interruption Provision of the Policy.

The Policy provides coverage, generally, for two broad categories of losses: property damage in Section B and time element loss in Section C. (D61-2:13,26.) The property damage section "insures against all risks of direct physical loss or damage to the insured property…from any cause except as herein excluded." (*Id.* at 13.) Section C of the Policy "insures Time Element loss…directly resulting from physical loss or damage of the type insured by this Policy…." (*Id.* at 26.)

Courts applying Florida law have determined that the phrase "direct physical loss and/or damage" requires a "tangible alteration to the covered property." *SA Palm Beach, LLC v. Certain Underwriters at Lloyd's London*, 32 F.4th 1347, 1358 (11th Cir. 2022); *see also Commodore, Inc. v. Certain Underwriters at Lloyd's London*, 342 So. 3d 697, 704 (Fla. 3d DCA May 11, 2022) ("'[D]irect physical loss of damage to property' requires actual, tangible alteration to the insured property for coverage to be triggered."). If an interruption of business is not caused by a tangible alteration to covered property by a covered peril, the Insured cannot recover for its business interruption losses. *Mama Jo's Inc. v. Sparta Ins. Co.*, 823 F. App'x 868, 879 (11th Cir. 2020).

FEC admitted that it incurred business interruption losses and extra expenses from "pre-storm gate removal and post-storm reinstallation" and that its claim "pertained to no 'property' damage whatsoever." (D1:7,9,13,15-16; D61-30:8-10; Appellant Br.[3] at 27.) Accordingly, coverage is not available under the Policy for any provisions that require direct physical loss or damage to property.

Curiously, despite acknowledging that it has not suffered any property damage as a result of Hurricane Irma, FEC contends that the Business Interruption provision covers its lost revenue claim in the amount of $3,388,423. (Appellant Br. at 20 and 37-38.) While FEC may be correct that the "removal, storage, and reinstallation of the crossing gates was . . . a 'necessary interruption' of its railway operations," any interruption of operations was not the result of direct physical loss or damage to covered property. FEC's preventative removal and on-site storage of the crossing gates prior to the storm does not constitute "direct physical loss or damage" to that property as urged by FEC. (*Id.* at 38.) *See Am. Male & Co. v. Owners Ins. Co.*, No. 21 CV 02595, 2023 WL 2646771, at *6 (N.D. Ill. Mar. 27, 2023) (insured's "voluntary mitigation measures to its property constitute neither losses nor damage to its premises").

FEC tries to shoehorn its claim into the Business Interruption and Consequential Loss coverage provisions (both of which require "loss or damage"

---

[3] Citations to "Appellant Br." refer to the Principal Brief filed by Appellant Florida East Coast Holdings Corporation.

to property) by arguing that, while it may not have sustained any direct physical "damage," it sustained "direct physical loss" by its "physical intervention and alteration of the crossing to avoid property damage and additional loss under the Policy." (Appellant Br. at 39.) This argument is circular and unavailing.

Courts applying Florida law have consistently found that "direct physical loss" does not mean loss of use and does not include situations where the insured physically alters its insured property. In *Commodore*, the court was faced with the issue of whether the presence of the COVID-19 virus constituted a "direct physical loss" to property. The court pointed out that "direct physical loss" "can include theft or complete ruin," but does not mean "loss of intended use." *Commodore, Inc. v. Certain Underwriters at Lloyd's London*, 342 So.3d 697, 703-04 (Fla. 3d DCA 2022). Physical alterations that an insured makes to its property, such as reconfiguring and moving furniture or other property, also does not qualify as "direct physical loss." *See, Atma Beauty, Inc. v. HDI Glob. Specialty SE*, 559 F. Supp. 3d 1311, 1316–17 (S.D. Fla. 2021); *Bourgier v. Hartford Cas. Ins. Co.*, No. 21-21053-CIV-MORENO, 2021 WL 3603601, at *4 (S.D. Fla. Aug. 12, 2021).

Where, as here, FEC removed and stored the crossing arms, there was no "direct physical loss" to that property. The crossing arms were not stolen or completely ruined; instead, they were removed and secured on-site for safekeeping until they could be put back in place after Hurricane Irma passed. Accordingly,

neither the Business Interruption nor the Consequential Loss provisions provide coverage for FEC's claim.

The plain language of the Consequential Loss provision also dictates that the provision is inapplicable under the circumstances of FEC's claim. The Consequential Loss provision states that the policy "insures against consequential loss… caused by change of temperature or humidity" and that "in the event of loss or damage to any property by reason of any peril insured against and such damage, without the intervention of any other independent cause, results in a sequence of events which causes physical damage to other property insured by this policy, and/or the Insured sustains an interruption of business as covered hereunder, then this policy will cover such resulting loss or damage." (D61-2:30.) Finally, the provision states that the policy insures "against loss to undamaged insured property not directly involved in the insured event (within a one (1) mile radius of the damaged property) that requires redesigning, relocation, removal or reconstruction due to the insured event." (*Id.*) None of those provisions apply under the circumstances of this claim.

**B.    The "Protection and Preservation of Property" Clauses in Sections B and C of the Policy Apply to FEC's Entire Claim.**

Two clauses in the Policy do provide coverage, subject to applicable deductibles, for expenses incurred *before* the insured suffers any sort of physical loss or damage to its property, such as FEC incurred in this case. The "Protection

and Preservation of Property" clause in Section B covers "reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured direct physical loss or damage to such insured property." (D61-2:21.) In addition, the "Protection and Preservation of Property – Time Element" clause in Section C provides coverage for business interruption experienced during the "48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending direct physical loss or damage insured by this Policy at such insured property." (*Id.* at 31.)

There can be no genuine dispute that FEC's claim properly falls under the "Protection and Preservation of Property" clauses. FEC has taken the position throughout this action that it incurred expenses and loss of income in order to "avoid significant property damage to" its crossing gates. (D1:5.) FEC incurred these expenses "[i]n advance of Irma's arrival," when it "dispatched crews on or about September 7, 2017 to begin unbolting, removing, and storing roughly 600 crossing gates." (*Id.*) Thus, the District Court correctly concluded that these expenses and resulting loss of income for the period from September 7, 2017

through September 9, 2017[4] fall squarely under the Protection and Preservation of Property clauses set forth in Sections B and C of the Policy. (D91:10.)

## C. The "Expenses to Reduce Loss" Provisions Apply Only *After* an Insured Sustains Covered Physical Loss or Damage to Property and Thus, are Inapplicable to FEC's Claim.

FEC has taken the incorrect position that the "Expenses to Reduce Loss" clauses in Sections B and C of the Policy provide coverage for its expense and loss of income claims. FEC has done so because it recognizes that the Protection and Preservation of Property clauses trigger the 5% Named Windstorm deductible that it has tried so hard to avoid. Nonetheless, as the District Court held, the Expenses to Reduce Loss provision in Section B "explicitly involves reduction—not prevention—of loss." (D91:11.) The District Court correctly held that to treat "reduce" (in the Expenses to Reduce Loss provision) and "prevent" (in the Protection and Preservation of Property provision) "interchangeably would render the 'Protection and Preservation of Property' provisions superfluous and fail to give each policy provision effect." (*Id*.) Because FEC's expenses were undertaken to *prevent* damage to the crossing gates and not to reduce the loss from damage that *already* had occurred, the Expenses to Reduce Loss provision is inapplicable. (*Id*.)

---

[4] FEC admits that it did not sustain any loss of income prior to the removal of the crossing gates. Thus, it is entitled to coverage for loss of income for the forty-eight hours following the actions it took on September 7, 2017.

The "Expenses to Reduce Loss" clause, by its own terms, requires that direct physical loss or damage already has occurred. The clause is triggered when the insured incurs expenses to reduce a "loss under this policy." (D61-2:20.) The phrase "loss under this policy" refers back to Section B's insuring clause, which itself requires "direct physical loss or damage to the insured property." (*Id.*) *See also Nat'l Union Fire Ins. Co. of Pittsburgh, Pa v. Texpak Grp. N.V.*, 906 So. 2d 300, 302 (Fla. Dist. Ct. App. 2005) (holding that agreement to cover expenses "caused by loss … covered herein" requires that expenses result from "damage or destruction" of property).

A recent Central District of California case discussed a similar expense to reduce loss provision. *See Always Smiling Productions, LLC v. Chubb Nat. Ins. Co.*, No. CV-21-5990, 2022 WL 4102315 (C.D. Cal. Sept. 6, 2022), *aff'd* 2023 WL 11849867 (9th Cir. July 11, 2024). In *Always Smiling*, the insured sought coverage for, among other things, steps it had taken to prevent and/or reduce the risk of cast members in a television production contracting the COVID-19 virus. The policy contained a coverage provision that, "in the event of loss or damage[,]" the insured must "[t]ake every reasonable step to protect the property from further damage, and to avoid or minimize any loss or damage[.]" *Id.* at *6. The plaintiff production company acknowledged that the provision directed the insured "to protect the property from further damage," but contended that the condition "goes far beyond

that by stating that Always Smiling shall take steps to 'avoid or minimize any loss or damage,' not just respond to past property damage." *Id.* The District Court disagreed, and the Ninth Circuit affirmed, finding that the provision applies only "in the event of loss or damage" and thus, does not respond to steps taken to prevent a future loss, but applies only to reduce or prevent further loss in the event loss or damage already has occurred. *Id.* at *6-7.

Similarly, here, the Expenses to Reduce Loss provision in Section B, as well as the corresponding provision in Section C, apply only after an insured sustains covered direct physical loss or damage to covered property and resulting Time Element loss and incurs expenses to reduce that covered loss.

FEC argues that the "District Court failed to address the Section C" Expenses to Reduce Loss provision. (Appellant Br. at 28.) Given that the District Court concluded that the Section B Expenses to Reduce Loss provision was inapplicable, it implicitly determined that the corresponding Section C coverage did not apply. Moreover, by its express language, Section C applies to cover "expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of the Policy." (D61-2:26.) Section C of the Policy, in turn, applies solely to "Time Element loss . . . directly resulting from physical loss or damage …." (*Id.*) Like the companion provision in Section B, the Expenses to Reduce Loss coverage in Section C is expressly limited so that it "will

not exceed the amount by which the loss has been reduced." (*Id.*) Lastly, FEC fails to point out that it argued at summary judgment that the "Business Interruption" and "Extra Expense" provisions applied, rather than the Section C Expenses to Reduce Loss provision. (*See* D91:6.) FEC only made a passing reference to the Section C Expenses to Reduce Loss provision below and did not expressly argue that it applied, so it cannot now complain that the District Court failed to address that provision. FEC also failed to sufficiently preserve that argument for appellate review. *See In re Pan Am. World Airways, Inc., Maternity Leave Pracs. & Flight Attendant Weight Program Litig.*, 905 F.2d 1457, 1462 (11th Cir. 1990) ("if a party hopes to preserve a claim, argument, theory, or defense for appeal, she must first clearly present it to the district court, that is, in such a way as to afford the district court an opportunity to recognize and rule on it.")

**D.** **Principles of Contract Construction Require a Finding That the "Protection and Preservation of Property" Provisions and the "Expenses to Reduce Loss" Provisions Do Not Provide Overlapping or Superfluous Coverage.**

That the Expenses to Reduce Loss provisions apply only to situations where the insured already has sustained a covered loss makes sense and is the only way to read the Policy without rendering other portions of the Policy superfluous. *See Hepp v. Paul Revere Life Ins. Co.*, 120 F. Supp. 3d 1328, 1337 (M.D. Fla. 2015) (applying Florida law) (requiring a court to read the policy as a whole and endeavor to give every provision full meaning and operative effect); *MJCM, Inc. v.*

*Hartford Cas. Ins. Co.*, No. 8:90-CV-2275, 2010 WL 1949585 at *5 (M.D. Fla. May 14, 2010) ("[T]he Court should construe the insurance policy as a whole. Each provision must be read in context with every other provision, and all of the provisions must be considered in their entirety. The Court must seek to give effect to every policy provision, and avoid a construction that will [give] effect to one provision while rendering another provision superfluous."); *Commodore, Inc.*, 342 So.3d at 701 ("It is firmly established that '[i]n interpreting insurance policies courts should read each provision as a whole, endeavoring to give every provision its full meaning and operative effect.'"); *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000) ("[I]n construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect.").

The Expenses to Reduce Loss provision in Section B talks about "loss as covered by this policy" and expenses incurred "as a consequence of a loss covered hereunder." Those phrases clearly refer to a covered loss, meaning that direct physical loss or damage *already* has taken place. By contrast, the Protection and Preservation of Property provision talks about "immediately impending, insured direct physical loss or damage," a phrase that clearly refers to a loss that has not yet taken place.

The only way to read these two provisions as a whole, without making one superfluous, is to find, as the District Court did, that the Protection and Preservation of Property provisions relate to impending direct physical loss or damage while the Expenses to Reduce Loss provisions relate to the reduction of direct physical loss or damage that already has occurred.

Indeed, the Protection and Preservation of Property provisions contain deductible language within the coverage provision to make clear that, even though direct physical loss or damage has not yet occurred, a deductible will apply to any costs the insured incurs to protect or preserve its property from immediately impending insured loss. By contrast, there is no need to include a deductible provision in the Expenses to Reduce Loss provisions because those provisions apply only when direct physical loss already has taken place and the deductible applicable to that direct physical loss would apply.

FEC argues that, rather than reading the "Protection and Preservation of Property" provisions and the "Expenses to Reduce Loss" provisions to provide coverage in different factual circumstances, the two provisions should be read to provide overlapping coverage. (Appellant Br. at 21-22.) Such an interpretation is contrary to Florida contract law.

Citing to *Commodore*, FEC argues the "canon against surplusage" is "not implicated when terms or clauses 'can reasonably be interpreted to cover different

scenarios.'" (*Id.* at 22.) In *Commodore*, the court examined the meaning of the words "loss of" and "damage to" in the phrase "caused by direct physical loss of or damage to property." The court concluded that the insured had conflated the terms "loss of" and "damage to" in such a way as to make them redundant. *Commodore*, 342 So. 3d at 703. The court held: "Because 'loss of' can reasonably be interpreted to cover different scenarios than 'damage to,'" the surplusage cannon is not violated." *Id.*, citing Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 176 (2012) ("If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred."). Here, rather than reading the "Protection and Preservation of Property" and "Expenses to Reduce Loss" provisions as covering "different scenarios" as required by Florida contract law, FEC's interpretation turns these provisions into overlapping coverage. Such an interpretation is not permitted.

Moreover, FEC cites to *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 311 (7th Cir. 2021), for the proposition that "insurance policies often use overlapping provisions to provide greater certainty on the scope of coverages and exclusions." In *Crescent Plaza*, however, the court was examining two different exclusions: the microorganism exclusion and the biological materials

exclusion, not coverage grants such as those at issue here. The insured argued that, if the microorganism exclusion applied to preclude coverage for the COVID-19 virus, there would have been no need to include the biological or chemical materials exclusion in the policy. *Id.* The court noted that, because the insurer bears the burden of establishing that an exclusion applies, a "prudent insurer will try to remove any doubt that certain categories of losses are excluded, which may lead to overlap between different provisions." *Id.* The court went on to note that "[s]ome redundancy in insurance contracts is normal, while constructing an endorsement to be completely superfluous is not." *Id.*

FEC's reliance on *Crescent Plaza* is misplaced, because the case actually supports the Insurers' position here. The *Crescent Plaza* court agreed that the policy should not be read to render a provision "completely superfluous," which is exactly what FEC is attempting to do here in arguing that the "Protection and Preservation of Property" provisions and the "Expenses to Reduce Loss" provisions provide overlapping coverage. (Appellant Br. at 43.) These two coverages apply to different factual scenarios. The former applies to protect property *before* a loss to that property. The latter applies to protect property from further damage *after* a loss.

FEC tries to argue that the two provisions apply under two different scenarios: one in which Hurricane Irma hit Florida but did not cause property

damage because of the protective measures taken, and one in which Hurricane Irma veered from Florida but FEC still incurred expenses because of the protective measures taken. (*Id.* at 32.) FEC argues that, in the former situation, the Expenses to Reduce Losses provisions would apply but in the latter situation, the Protection and Preservation of Property clauses would apply. FEC is wrong.

The two scenarios proffered by FEC create a distinction without a difference. As we explained above, coverage for expenses incurred before the insured suffers any sort of physical loss or damage to its property is only provided through the Protection and Preservation of Property clauses. Since direct physical loss or damage to FEC's property did not occur in both scenarios, coverage for the protective measures taken in both scenarios is only provided through the Protection and Preservation of Property clauses.

**E.     The "Expenses to Reduce Loss" Provisions in Sections B and C of the Policy are not "Sue and Labor" Clauses.**

Further complicating its argument, FEC refers to the "Expenses to Reduce Loss" provisions in Sections B & C of the Policy as "the sue-and-labor clauses of the Policy", which they are not. (Appellant Br. at 7, 19, 27, 29.) In its brief, FEC describes "sue-and-labor" as an "ancient insurance concept requiring insurers to reimburse insureds for expenses necessarily incurred to reduce imminent loss." (*Id.* at 19, 28.) But the specific sue-and-labor concepts referenced by FEC – taking "steps to prevent a threatened loss" or an "imminent loss" – are concepts that only

apply to the "Protection and Preservation of Property" provisions of the Policy, as only those provisions cover the insured for expenses incurred to prevent an imminent loss.

FEC cites *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482 (5th Cir. 1960), to support the position that sue-and-labor clauses generally provide coverage for expenses to prevent a threatened or imminent loss. But that issue was not addressed in *Reliance*, since a covered loss had already occurred. The Supreme Court of Florida directly addressed that issue in *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.* ("*Swire II*"), 845 So. 2d 161, 169 (Fla. 2003), holding that a clause substantially similar to the one at issue in *Reliance* did not provide coverage for expenses to "prevent[] a covered loss from ever arising" and "where no loss had occurred [and] no loss was in progress."

The *Swire II* court highlighted that "[i]n Florida, coverage under an insurance contract is defined by the language and terms of the policy." *Swire II*, 845 So.2d at 169. According to the language and terms of FEC's Policy, the only provisions that expressly cover expenses for, and losses caused by, the prevention of "immediately impending direct physical loss and damage" are the "Protection and Preservation of Property" provisions. Thus, the "Protection and Preservation of Property" provisions, not the "Expenses to Reduce Loss" provisions, are the true sue-and-labor clauses in the Policy.

26

FEC goes on to argue that "[a]ny interpretation that limits the coverage provided by such a sue-and-labor clause to only post-storm expenses is *per se* unreasonable." (Appellant Br. at 29.) But, neither the Insurers nor the District Court limited coverage in such a manner. The Insurers argued, and the District Court found, that the Policy's "Protection and Preservation of Property" provision – which is a sue and labor clause – did, in fact, apply to provide coverage for pre-storm expenses. (D91:13.) In this case, however, the coverage provided did not exceed the applicable Named Windstorm deductible.

F.      **FEC Improperly Contends That the Insurers' Interpretation of the Policy Provisions Would "Incentivize the Insured to Stand Idly by Rather Than Take Proactive Measures to Protect Property."**

FEC makes an illogical leap in its argument by contending that the District Court's and Insurers' interpretation of the Policy would "incentivize the insured to stand idly by rather than take proactive measures to protect property." (Appellant Br. at 19, 51.) The Policy explicitly provides coverage in the "Protection and Preservation of Property Coverages" provisions in Sections B and C for the cost to take proactive measures to protect property. Such coverage is, however, subject to a deductible, and in this case, where the measures taken by FEC were to protect the Automatic Crossings from damage by Hurricane Irma, a "Named Windstorm," the Named Windstorm deductible applies. While in the factual scenario involved in FEC's claim the cost to protect the Automatic Crossings falls within the

deductible, in other factual situations, the cost to protect property would be larger than the applicable deductible. For instance, in cases involving impending fire damage or impending storm damage that does not involve a "Named Windstorm," the cost to protect the Automatic Crossings or other property may, indeed, exceed the applicable deductible. Here, though, the higher Named Windstorm deductible, which was bargained for by both parties, applies to Named Windstorm claims because of the obvious increased risk and exposure those types of storms create. FEC cannot now renegotiate the Policy terms to which it agreed.

## II. The District Court Properly Concluded That the 5% Named Windstorm Deductible Applies to FEC's Hurricane Irma Claim and Must Be Calculated Using the Figures Submitted by FEC for All Claimed Locations.

The amount of FEC's claim is far less than the applicable Named Windstorm deductible, so the Insurers do not owe any sums to FEC for its Hurricane Irma claim. The Policy states that, "[i]n each case of loss covered by this Policy, the Insurers will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible…." (61-2:13.) Here, where more than one property is involved in the claim, the deductible will apply against the "total loss covered by this Policy in any one occurrence." (*Id*.) The applicable deductible for losses caused by Hurricane Irma is the Named Windstorm deductible, which is calculated as the larger of $750,000 or "5% of

property values at locations damaged from and as respects Named Windstorm." (*Id*.)

FEC contorts the deductible provision by arguing that the $750,000 "Railroad Operations" deductible applies to FEC's claim because FEC's losses clearly pertain to Railroad Operations. (Appellant Br. at 24.) Moreover, FEC argues that "this Court must choose the interpretation that maximizes coverage for FEC." (*Id.* at 25.) FEC's argument ignores the reality that the claimed loss here arises out of a Named Windstorm. Thus, while the Railroad Operations deductible of $750,000 might apply to costs undertaken by FEC to prevent damage because of an impending wildfire or a tornado, the Policy contains a very specific deductible, i.e., the Named Windstorm deductible, to situations where FEC's claim arises out of a named windstorm such as Hurricane Irma.

The Policy also states: "If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided." (D61-2:13.) Accordingly, where, as here, the Named Windstorm deductible is larger than the Railroad Operations deductible, the Named Windstorm deductible applies. *See*, *e.g.*, *Pan Am Equities, Inc. v. Lexington Ins. Co.*, No. H-18-2937, 2019 WL 2115173 (S.D. Tex. May 2, 2019) (where policy provided that the largest of two or more deductibles applies to a single occurrence, the court applied the larger Named

Storm deductible to "'ensure that an insured cannot escape the applicability of the higher deductible' for a loss arising out of a Named Storm, simply because the Named Storm caused flooding for which a lower deductible might also apply").

Indeed, FEC acknowledges the possibility that both the $750,000 Railroad Operations deductible and the 5% Named Windstorm deductible could apply. (Appellant Br. at 25-26.) But, FEC argues that because the Named Windstorm deductible is calculated as "5% of property values," and because there are no "locations damaged from" a Named Windstorm, then the larger deductible is the $750,000 Railroad Operations deductible. (*Id.* at 26.) This argument is incorrect.

Both the Section B and C Protection and Preservation of Property provisions refer to the application of a deductible. Section B's clause directs that "Insured Property covered through this clause shall be added to the direct physical loss or damage otherwise recoverable under this policy, and subject to the applicable deductible…." (D61-2:21.) Additionally, Section C's clause expressly states that its coverage "is subject to the deductible provisions that would have applied had the physical loss or damage occurred." (*Id.* at 31.) Thus, because the cost of the preventative actions taken with respect to the crossing gates falls within Section B Protection and Preservation of Property coverage and the associated business interruption falls with Section C Protection and Preservation of Property coverage, those costs are subject to a deductible provision, here the 5% Named Windstorm

deductible that applies to this Hurricane Irma loss. The "property values" that are to be considered, therefore, are the property values at the locations where FEC took steps to protect and/or preserve property, *i.e.*, the values of the Automatic Crossings.

FEC argues that the "Section C Preservation Extension also does not direct the parties to apply the deductible amount that would have applied if there were 'locations damaged,'…." (Appellant Br. at 48.) But, that is precisely what Section C's Protection and Preservation of Property provision requires. The applicable deductible is the one that would have applied had the "physical loss or damage occurred." Here, it cannot seriously be disputed that the deductible that would have applied if there had been physical loss or damage to the Automatic Crossings is the 5% Named Windstorm deductible.

In calculating the 5% Named Windstorm deductible, the Insurers urged, and the District Court agreed, that the applicable values were those provided by FEC itself relative to the Automatic Crossings. (D91:13.) In connection with the purchase of the Policy, FEC submitted an "Estimated Property Value Summary" to the Insurers. (D61-13:1.) The Estimated Property Value Summary identified the Total Insured Values as $824,440,808, which was broken down by Property Values Total of $725,654,663 and Business Interruption Values of $98,786,145. (*Id.* at 3.) The Property Values were broken down into fourteen categories, one of which was "Automatic Crossings" with a value of $219,019,894. (*Id.* at 3, 10-39.)

Attached to the Estimated Property Value Summary page is a spreadsheet provided by FEC that contains, among other things, listings for Automatic Crossings at 623 different locations, each valued between $233,506 to $529,186. (*Id.* at 10-39.) Here, the insurance claim at issue involves Automatic Crossings at all 623 locations, for a total value of $219,019,894. (D1:5.) Five percent of that total value equates to $10,950,994.70, which exceeds FEC's claim for both expenses incurred to protect and preserve property, as well as the resulting loss of income.

Finally, FEC argues that there is a factual dispute with respect to the value of the "locations damaged." (Appellant Br. at 54.) In particular, FEC contends that the value of the locations damaged "would depend on of [sic] the location of the gates that would have been 'damaged,' and the age, condition and values of the equipment at such locations." (*Id.*) FEC goes on to state that there is "no record evidence of any of that." (*Id.*) But, as the District Court recognized, FEC, itself, provided to the Insurers the value of each automatic crossing and therefore, there is no need to conduct any discovery regarding the value of each location. (D91:13.) FEC provided a statement of values to the Insurers, with a detailed breakdown, including the location name, mile post number, and value, of the "Grade Crossing Warning Devices" on a replacement cost basis. (D61-13.) Additional discovery on this valuation issue is not warranted. The District Court appropriately awarded summary judgment based on the undisputed facts provided by FEC to the Insurers.

## CONCLUSION

Based on the foregoing, the Insurers respectfully request the Court affirm the District Court's judgment in favor of the Insurers.

Dated: September 16, 2024

Respectfully submitted,

*/s/ Eric T. Krejci*
Wayne R. Glaubinger
Eric T. Krejci
Perry Goodman
Mound Cotton Wollan & Greengrass LLP
One New York Plaza Fl. 44
New York, New York 10004
WGlaubinger@moundcotton.com
EKrejci@moundcotton.com
PGoodman@moundcotton.com
Tel: (212) 804-4200
Fax: (212) 344-8066

*Counsel for Defendants-Appellees*

*/s/ Paul L. Fields, Jr.*
Paul L. Fields, Jr.
Stephen A. Kahn
Fields Howell, LLP
665 8th Street NW
Atlanta, GA 30318
pfields@fieldshowell.com
skahn@fieldshowell.com
Tel: (404) 214-1250
Fax: (404) 214-1251

*Counsel for Defendant-Appellee Ironshore Specialty Insurance Company*

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for Defendants-Appellees hereby submit its Certificate of Compliance pursuant to Fed.R.App.P.32 and hereby certifies:

1. This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B)(i) because it contains 7,350 words.

2. This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type-style requirements of Fed.R.App.P.32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word 365 in a 14-point font, Times New Roman.

*/s/ Eric T. Krejci*
Eric T. Krejci

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served electronically via CM/ECF on all counsel or parties of record this 16th day of September 2024.

*/s/ Eric T. Krejci*
Eric T. Krejci